# WHEELING.

## HERRING v. LEE.

| 22 | 661 |
| 49 | 82 |

Submitted September 6, 1883—Decided November 24, 1883.

1. The effect of the late civil war between the United States and the Confederate States was to make, during its pendency, every resident within the military lines of the Federals the enemy of each and every resident within the military lines of the Confederates without regard to his occupation, individual sympathies or opinions ; and such residents within the lines of the opposing belligerents could have no friendly intercourse, communication or business relations of any kind whatever with each other. (p. 667.)

2. Where during said war a county of this State was abandoned by the Confederates and the clerk of the county court of said county went with them, taking with him all or the greater part of the records of his office, and immediately thereafter said county passed into the actual possession and under the control of the Federals, and so continued until they were driven out about four months thereafter—the said clerk all that time remaining within the lines of the Confederates. HELD :

That no one residing in said county within the Federal lines could as the deputy of such clerk conduct the business of said clerk's office within the Federal lines for or in the name of such clerk while he remained within the Confed-

erate lines ; and the acts of any one attempting, during that time, to act as such deputy for and in the name of such clerk, within the Federal lines, are absolutely void. (p. 668.)

3. There can be no such officer as a *de facto* deputy. (p. 669.)

4. A conveyance of land duly acknowledged is copied upon one of the deed-books in the county court clerk's office by a mere spoliator or intruder, and at the next term of said county court said conveyance is returned to the court among the list of deeds recorded in the office during the preceding vacation, and an order is made on the records of said court stating that said conveyance and others had been admitted to record in the clerk's office of said county. HELD :

    I. That such order of the county court did not make said conveyance a recorded instrument ;

    II. That the placing of said conveyance upon the deed-book of said office being an unauthorized act and void, it is not a record and may, therefore, in a court of equity or by any other proper proceeding, be assailed and set aside upon parol evidence. (p. 671.)

The facts of the case appear in the opinion of the Court.

*D. B. Lucas, H. Conrad* and *S. J. C. Moore* for appellant.

*Charles J. Faulkner* for appellee.

SNYDER, JUDGE:

By deed, dated March 24, 1882, Charles S. Lee of Berkeley county, in consideration of love and affection, conveyed to Mann R. Page a tract of sixty-five acres of land in the vicinity of Martinsburg, Berkeley county, on which said Lee then resided, "in trust, however, for the following use and purpose and no other: To the use and benefit of Margaret H. Lee, the wife of said Charles S. Lee, as if she were unmarried, during her natural life, and after her death to the use of her children; and also upon this further trust: That upon the request in writing of her, the said Margaret H. Lee, it shall be the duty of said trustee to convey said property to such person and such persons as said Margaret H. Lee may direct and appoint."

This deed was duly acknowledged by the grantor and said acknowledgment properly certified by a justice of said county

on March 26, 1862, and on said deed are the following en-
dorsements:

"Berkeley County, to-wit:

"April 1, 1862.

"The foregoing deed of trust from Charles S. Lee to Mann
R. Page, for the benefit of Margaret H. Lee, was this day
produced in the clerk's office, properly authenticated, and
admitted to record.

"Teste:

"E. G. ALBURTIS, *C. B. C.*"

"Recorded in Book 62, page 22."

On October 9, 1862, said Charles S. Lee and Margaret H.
his wife, by deed of that date, "in consideration of the sum
of five thousand dollars to them in hand paid," conveyed to
Ezra Herring the same tract of land conveyed by said deed
of March 24, 1862, with general warranty and other cove-
nants.  The acknowledgment of the grantors and privy ex-
amination of the wife in due form were certified upon this
deed on the day of its date, and on August 2, 1865, it was
duly admitted to record in said county.  The grantee, Ezra
Herring, was at once put in possession of said land and he
has so continued ever since.  At the time he made said pur-
chase, said Herring had no actual notice of the said prior
conveyance of March 24, 1862, and never had thereafter any
notice or knowledge of the existence of said conveyance until
the year 1873, at which time he was informed that such a
deed existed and that it had on April 1, 1873, been copied in
a book in the clerk's office of the county court of said county
at the instance of said Charles S. Lee.  About six weeks
after obtaining this information and having learned that
Mrs. Lee and her children were claiming the land under
said deed, the said Herring, on July 2, 1873, instituted this
suit in the circuit court of said county, against the said Chas.
S. Lee and wife and his children and the trustee, to have said
deed declared void and the cloud resting upon his title to the
land by reason of the record made of same on April 1, 1873,
removed and for general relief.

In the plaintiff's original and amended bills three separate
grounds are relied on to show that the defendants have no
valid claim to said land:

*First*—That said deed of March 24, 1862, was never presented in the clerk's office of Berkeley county before the clerk of said county court, nor before any one authorized to act as such or for said clerk, nor was the same ever in law admitted to record prior to April 1, 1873;

*Second*—That the grantor, when he executed said deed, did so with intent to defraud the plaintiff as a subsequent purchaser; and

*Third*—That the power of appointment vested by said deed in the said Margaret H. Lee was, by the deed of October 9, 1862, to plaintiff from her and her husband, fully executed and the title thereby vested in the plaintiff.

In the view this Court takes of the case, it is unnecessary to consider the second and third grounds thus presented by the plaintiff and I shall, therefore, omit any statement of the facts relating to said grounds.

The said Charles S. Lee and also his wife and the trustee deny in their answers the charges of the plaintiff affecting the regularity of the recordation or the validity of said deed of March 24, 1862, and the trustee asks that the said land may be decreed to Mrs. Lee and her children and the plaintiff required to account for rents and profits. There was a general replication to these answers. On May 26, 1876, the circuit court entered a decree granting the relief prayed for by the plaintiff and the defendants appealed to this Court.

It is not claimed that Herring, the appellee, had any actual notice of the deed of March 24, 1862, until after his purchase had been completed and his deed of October 9, 1862, had been duly recorded, nor is it seriously questioned that he is a purchaser for a valuable consideration. He being then a subsequent purchaser for a valuable consideration without actual notice, the statute declares the prior deed to Mann R. Page, trustee, absolutely void as to him unless it was at the time of his purchase or before the recordation of his deed, duly recorded. Sec. 5, ch. 118, Code of Virginia, and sec. 5, ch. 74, Code of West Virginia. The single enquiry then is, was said deed duly recorded prior to August 2, 1865?

The material facts bearing upon this enquiry are undisputed and are as follows: That the transactions, out of which

this controversy has arisen, took place during the late war in
Berkeley county; that prior to March 1, 1862, the Confed-
erate military forces were in possession of Martinsburg and
said county; that about the last of February, 1862, the re-
cords and papers, or the greater part of them, belonging to
the circuit and county court clerks' offices of said county
were removed therefrom and taken to Winchester or some
other point so as to prevent them from falling into the pos-
session of the Federal forces; that E. G. Albertis, who had
been duly elected and qualified as such for the term of six
years from July, 1858, was then the clerk of the county court
of said county, and that Joseph Burns was from and after
his appointment as such in November, 1861, his acting and
authorized deputy; that about the 1st day of March, 1862,
the Confederate forces evacuated Martinsburg and went to
Frederick county in Virginia, and both said clerk and his
deputy went with them, and that on that day the Federal
army took possession of Martinsburg and remaind there
continuously until July 3, 1862, when the Federals were
driven out by the Confederates; that neither said clerk nor,
so far as appears, his deputy was in Martinsburg or within
the Federal lines at any time during the months of March
or April, 1862, after they left on the first of March of that
year; that after and during the occupation of the Federal
army, both the clerks' offices of said county were occupied
and used by the said army as a provost marshal's office and
as barracks for soldiers and that neither was used as a clerk's
office.    The records of the county court office show that, at
the May term, 1861, R. A. Sommerville was appointed and
qualified as deputy for E. G. Alburtis, clerk of said county;
they also show the following entry:

"At a court held for Berkeley county, at the court-house
of said county, on Monday, April 14th, 1862.   Present:—
Andrew W. McCleary, presiding justice, John E. Brady and
Joseph S. Dehaven, gent. justices.

"The following list of conveyances, &c., was admitted to
record in the clerk's office of this court since the March
term, to-wit:

"Deed of trust from Charles S. Lee to Mann R. Page,
benefit of Margaret H. Lee, for real estate.

84

" Deed of b. and sale from Richard A. Webster and wife to Louis Schen, for real estate."

The said records also show, that on and after March 19, 1862, a number of marriage licenses in the handwriting of said R. A. Sommerville were issued.

The said Sommerville acted as deputy clerk from the time of his appointment in May, 1861, until the November term, 1861, when he was removed by the clerk and the said Joseph Burns was appointed and qualified in his place. At the April term, 1862, of said court, the said Alburtis, clerk, and his deputy being absent in the Confederate lines, the said Sommerville at the suggestion of some of the members of the court, made the journal entries of the proceedings at that term.

Deed-book No. 62 and several others are missing from said office. The said deed of March 24, 1862, does not appear of record in any of the regular deed books now in said office and no evidence other than what has been hereinbefore stated has been produced to show that it was in fact ever recorded before April 1, 1873.

The endorsements on the said deed, hereinbefore copied, are wholly, including the signature, "E. G. Alburtis," in the handwriting of said R. A. Sommerville and they were made without the knowledge or authority of said Alburtis. Some time between January 1, 1873, and April 1, 1873, the said deed with said endorsements then on it was found in the bundle of deeds in said office by the clerk, who at the request of the defendant, Charles S. Lee, on April 1, 1873, recorded it and sent the original to said Lee. There are some other facts in the record relating to this transaction, which, in my view of the case, have not the most remote bearing upon the question to be decided and I, therefore, omit them as entirely immaterial.

The foregoing facts resolve themselves into three legal enquiries:

*First*—Assuming that said R. A. Sommerville had been a legal deputy of E. G. Alburtis, clerk, while Berkeley county was in the occupancy and under the control of the Confederates and that he had not been removed, could he have legally acted as such deputy after the Confederates and said

clerk with them had abandoned said county and it had passed into the occupancy and under the control of the Federals? That is, can a clerk who voluntarily leaves his office and takes up his residence within the territory of one belligerent have a deputy conducting the business of his office for him within the territory of the other belligerent?

*Second*—If said Sommerville could not have acted as such deputy by authority of said clerk, then, could he have acted as such without such authority? In other words, if he could not act as deputy *de jure*, could he act as deputy *de facto*? And

*Third*—If he could have done neither of these, was he clerk *de facto* of said county court at any time between March 1, 1862, and April 2, 1862, and did he act as such?

1. As to the first enquiry. Can the relation of clerk and deputy exist when the one is in territory hostile to that of the other? Webster defines a *deputy* to be "one appointed as the substitute of another, and empowered to act for him, in his name or on his behalf;" and he defines an *agent* as "one intrusted with the business of another; an attorney; a minister; a substitute; *a deputy*; a factor." Bouvier defines *a deputy* to be "one authorized by an officer to exercise the office or right which the officer possesses, for and in place of the latter." There is this distinction between the doing of an act by an agent and doing an act by a deputy. An agent can only bind his principal when he does the act in the name of his principal; but a deputy may do the act and sign his own name, and it binds his principal. A deputy, however, is in law deemed an agent. Story on Agency, § 149, *note*. These definitions clearly show that there must be an officer or principal in existence and capable of acting for himself at the time the deputy or agent is acting for him. When the officer or principal is dead and that fact is known or he is otherwise disqualified to act for himself he cannot act by deputy or agent. *Hunt* v. *Rousmanier*, 8 Wheat. 174; Story's Ag. § 488. So if in any manner the principal's power over the office or subject-matter of the agency becomes extinct, the authority of the deputy or agent to act also ceases. Story's Ag. § 499. This must be so of necessity; for unless there is an office in the possession or under the control of the officer

he cannot perform the duties of his office, and to hold that the officer could act by deputy in such case would be to hold that he could do by deputy what he had not the power to do himself. Such a position is contrary to both law and reason. Then, the next point is, had the said Alburtis, clerk, such possession of the clerk's office of Berkeley county, or had he such control over it, on April 1, 1862, as to enable him to admit to record the said deed of March 24, 1862? The facts hereinbefore stated show that at that time he was within the Confederate lines and said clerk's office was within the Federal lines. One of the immediate consequences of a declaration of war, which has been fully recognized by the decisions of the Supreme Court of the United States and this Court as applicable to our late civil war, is an absolute interruption and interdiction of all commercial intercourse and dealings between the residents of the two belligerents. The idea, says Kent, that any commercial intercourse, or pacific dealing, can lawfully subsist between people at war, except under a special license, is utterly inconsistent with the duties growing out of a state of war. The war at once puts an end to all dealings and all communications with each other. This doctrine renders null and void all contracts made with the enemy during the war; it prohibits the drawing of bills of exchange or the remission of money by one belligerent to the other. All endeavors to trade with an enemy, by the intervention of third persons, or by partnerships are equally forbidden, and no artifice can legalize any trade, communication or contract of whatsoever character without the express permission of the government. The people of the belligerent sections or States cannot commence or carry on any correspondence or business together and all partnerships and agencies existing between the people of the two parties prior to the war are dissolved by the mere force and act of the war itself, and all created during the war are absolutely void. 1 Hallack's Inter. Law 481; 1 Kent's Com. 66; *Haymond* v. *Camden, supra.*

It is also a well settled principle of international law, that a state of war makes all the subjects of the one belligerent the legal enemies of each and every subject of the other, and if the one is found within the territory of the other he is

liable to be seized and retained as a prisoner of war. This hostile character results from political ties and not from personal feelings or individual opinions. So long as these political ties continue or so long as the individual continues to be a subject or resident of the opposite belligerent he remains an enemy; such are public enemies, whatever may be their occupation or their private sympathies or sentiments. It has been held by this Court, that during the late war every citizen who elected to reside in the South or within the Confederate lines, thereby became an enemy of every citizen residing within the Federal lines without reference to his individual opinions or disposition—*Haymond* v. *Camden, supra.*

Alburtis, the said clerk, being a resident within the Confederate lines and the said Sommerville being a resident within the Federal lines, they were, according to the principles just stated, public enemies of each other. They could have no correspondence or communication with each other; and any business relation or agency existing between them before the war, or at the time they became such enemies to each other, was *ipso facto* dissolved and any such relation established after they became such enemies was absolutely void. From this it follows necessarily, that said Sommerville could not, at the time said deed purports to have been recorded, have been legally acting as the deputy of said Alburtis, the clerk of said court. The said Alburtis himself could not at that time have acted as clerk of said court in Martinsburg. If he had come there and attempted to do so, he would have been liable to arrest and imprisonment as a public enemy. Being thus disqualified and inhibited from acting, he was as to said office *civiliter mortuus*, and during the occupancy of said county and office by the Federal authorities he could neither act as clerk himself nor have a deputy acting for him.—*The King* v. *The Corporation of Bedford,* 6 East. 356; Story's Ag. § 488.

2. If, as we have seen, said Sommerville could not have acted as deputy *de jure* for said Alburtis, clerk, could he have acted as such *de facto*? Remembering that a deputy is one *authorized by an officer* to exercise the office or right, which the officer possesses, for and in his place, it is apparent that there can be no such a thing as a deputy acting *without*

*authority* from his principal. He is a mere agent and unless he acts by express or implied authority from the officer his acts are not binding upon him and therefor void. The principal is liable for the acts of his deputy and for his neglect of duty. To declare that any person who might assume to act as deputy, in the absence and without the knowledge of the officer, would be to make such officer liable for the acts of a person he may never have seen or had any communication with. If such be the law, the Federal provost marshal who had possession of the clerk's office of said county in March and April, 1862, or any private soldier who may have been quartered in it, by assuming to act as *de facto* deputy, could have made Alburtis liable for his acts, though he never saw or had any communication with him. The officer has also a right to remove his deputy or call him to an account for his acts. How could Alburtis, when he was forbidden by public law to enter Martinsburg or to see such assumed deputy, remove or call him to account? Suppose he had come there and found said provost marshal acting as his deputy and he had attempted to call him to account, what would have been the result? He would in all probability have been put in the guard house and said *de facto* deputy continued to act. The idea that there could be such an officer as a *de facto* deputy is an absurdity of itself. It is to assume that there may be an agent acting for and creating liabilities against a principal who has conferred no authority, has no control over and who may have no knowledge of the existence of the agent or deputy so acting. It is, therefore, certain that said Sommerville could not, on April 1, 1862, have been the *de facto* deputy of Alburtis, the clerk of said court.

3. If said Sommerville was not on the said 1st day of April, 1862, either the *de jure* or the *de facto* deputy of Alburtis, as we have shown he was not, was he at that time *de facto* clerk of said county court and did he in making the endorsement on said deed of March 24, 1862, act as such *de facto* clerk? If he did not so act in endorsing said deed then it is altogether immaterial whether he was or was not at that time such *de facto* clerk. The policy and reason of the rule upon which the acts of *de facto* officers are sustained and held valid as to third parties and the public in collateral

proceedings are, that a person requiring official duties to be performed, cannot be expected to inquire into the title of the officer when he finds him in the open and undisputed occupancy of the office and in the reputed and notorious discharge of its duties. But when in civil cases, at least, the public or third persons have knowledge that the person so acting or pretending to act is not the officer *de jure*, the reason of the rule ceases and the rule itself for validating such act does not apply. If the person who invokes protection for the act of a *de facto* officer, knew when the act was done that it was not the act of a legal officer, the law will not sustain such act or hold it valid as to such person but will declare it void—Opinion in *State* v. *Carroll*, 38 Conn. 467; *Rex* v. *Bedford Level*, 6 East. R. 357; *Rex* v. *Lisle*, Andrews R. 163.

Consequently, in the case at bar, it is not necessary to consider whether or not said Sommerville was in the undisputed occupancy of said office, and in such reputed and notorious discharge of its duties as to make him the clerk *de facto* and his acts valid as to third persons who had no notice of the fact that he was not the *de jure* officer. But assuming that he may have been such, though the proof seems to be scarcely sufficient to support such an assumption, his act in endorsing or even in pretending to record said deed of March 24, 1862, would be invalid as to the grantee in said deed, because he signed the name of Alburtis as the clerk of said office. He did not claim to act as clerk of said office either *de jure* or *de facto*, but by this very act declared and gave notice to the party invoking his official services, that he was not such clerk and did not claim to act as such. His act then, in pretending to record such deed was for the reasons we have given and according to the authorities cited, the act of a mere spoliator or intruder, if it was not an actual forgery, and it was, therefore, absolutely void—*Tucker* v. *Aiken*, 7. N. H. 113, 140; Bla. Tax Titles 93; *Margate Pier* v. *Hannam*, 5 Eng. C. L. R. 278; *Griffin* v. *Cunningham*, 20 Gratt. 43, 65, 80.

But it is contended the order of the county court of Berkeley county made on April 14, 1862, which recites that a "deed of trust from Charles S. Lee to Mann R. Page, benefit

of Margaret H. Lee, for real estate," was among the list of conveyances admitted to record in the clerk's office of that court since the March term, is conclusive of the fact that such was duly and legally recorded. And it is also contended that any irregularity or invalidity which may have attached to the acts of said Sommerville or to the registration of said deed was cured and made valid by the Act of the Legislature passed March 31, 1873, Acts 1872-3, page 168-9. In support of these positions the following authorities are relied on by the appellants' counsel: *Hawkins* v. *Forsythe*, 11 Leigh 294; *Carper* v. *McDowell*, 5 Gratt. 212; *Taliaferro* v. *Pryor*, 12 *Id.* 277.

These cases fully establish the doctrine that whatever appears on the records of a court or clerk's office and has been duly authenticated by the signature of the judge or proper officer must be held to be an absolute verity and cannot be collaterally assailed. But this court, in a very recent decision, has expressly held that it is only that which was actually placed on the record-books by an officer authorized to place it there, and which is properly authenticated, that is entitled to be regarded as an absolute verity. If a record is interlined or erased by some unauthorized person such alteration constitutes no part of the record and it may be assailed by parol testimony. This is not controverting the absolute verity of the record, but it is simply enquiring what really constitutes the record. If this were not allowed, the absolute verity attributed to a record could be used to give sanction to a forgery or fraudulent erasure of the record. *State* v. *Vest*, 21 W. Va. 796; *Brice* v. *Floyd*, 7 Leigh 647.

Such being the law in regard to interlineations and erasures in the records of a court, there can be no question that the same rule should be applied in a case like the one before us where there has been a spoliation or a forgery imposed upon the court as a genuine record by a mere intruder or usurper. *Rose* v. *Himeley*, 3 Cr. 268; *Forbes* v. *Hyde*, 31 Cal. 347; *Turner* v. *Stipp*, 1 Wash. 319; *Maxwell* v. *Light*, 1 Call. 117; *Dawson* v. *Thruston*, 2 H. & M. 132; *Horsly* v. *Garth*, 2 Gratt. 472; *Johnson* v. *Slater*, 11 *Id.* 322; *Starbuck* v. *Murray*, 5 Wend. 148.

The act of said Sommerville in attempting to admit said

deed to record being, as we have seen, absolutely void and not simply voidable, the said curative act of March 31, 1873, if it could be construed to apply to this case, would be unconstitutional and void.   If it was competent for the Legislature to make a void proceeding or act valid, then said act might be invoked to sustain the deed in this case. But upon that question there cannot be a moment's hesitation. The Legislature can no more impart binding efficacy to a void act than it can take one man's property and give it to another. Indeed to do one is to accomplish the other.   What difference can it make whether the act directly or indirectly takes the property of one and transfers it to another?   To make a void act valid and thus effect the transfer is the same thing as making the transfer directly.   Such was not the purpose or intent of said statute and if it had been it would be absolutely void. *McDaniell* v. *Correll*, 19 Ill. 226; *Denny* v. *Mattoon*, 2 Allen 361; 20 Gratt. 109; Cooley's Const. Lim. 381–2.

For the foregoing reasons I am of opinion that said deed from Chas. S. Lee to Mann R. Page, dated March 24, 1862, was never legally recorded and that it is, therefore, void as to appellee, the grantee, in the subsequent deed of October 9, 1862, from the same grantor; consequently, the said decree of the circuit court of May 26, 1876, must be affirmed with costs to the appellee against the appellants and thirty dollars damages.

THE OTHER JUDGES CONCURRED.