J. HERBERT SMITH et al. v. THE CITY OF WILMINGTON et al.

*Election—Registration—Voters.*

1. A "qualified voter" is one who is not only eligible to vote, but one who is duly registered.

2. The statutes of North Carolina prescribe registration as an essential qualification of a voter and are mandatory; the authorities charged with their enforcement have no discretion to dispense with any of their directions.

3. A voter who has been duly registered cannot be deprived of his right to vote, nor will he lose his character as a "qualified voter" by a failure to re-register, unless a new registration is made in pursuance of the plain requirements of the law.

4. An election to ascertain the will of the qualified voters of the city of Wilmington upon a proposition to subscribe to the capital stock of the Wilmington, Onslow & Eastern Carolina Railroad Company (authorized by ch. 233, Laws 1885,) should be held and determined by the registration, properly revised, made biennially as prescribed in its charter for city elections. The mayor and aldermen have no

power, either under the charter of the company or of the city, or of the general law of the State, to cause a new registration to be made.

SMITH, C. J., dissenting.

(*Perry* v. *Whittaker,* 71 N. C., 475; *Southerland* v. *Goldsboro*, 96 N. C., 49; *Duke* v. *Brown*, Ibid., 127; *McDowell* v. *Construction Co.*, Ibid., 514, and *Wood* v. *Oxford*, 97 N. C., 227, cited).

This was a CIVIL ACTION, in NEW HANOVER Superior Court, heard by *Philips, Judge,* at Chambers, on the 24th day of October, 1887.

The action is brought by the plaintiffs, tax payers of the City of Wilmington, and all other like tax payers who shall join in the same and contribute to the costs thereof, against that City and the other defendants, who are the Mayor and Aldermen thereof, to contest the validity of an election held on the 11th day of August, 1887, in pursuance of an order made by the said last mentioned parties, in the said City "for the purpose of ascertaining the will of the qualified voters of this City upon the question of a subscription of $100,000, (one hundred thousand dollars,) by the City to the capital stock of the Wilmington, Onslow and East Carolina Railroad Company," as provided and allowed by the charter of that company, the statute, (Acts 1885, ch. 233, §§ 13, 14.)

This statute allows "any county, township, city or town," as therein provided, " to subscribe to the capital stock of said company," if a majority of the qualified voters thereof shall vote in favor of a proposition to be voted upon, specifying a fixed amount of such stock to be subscribed for, at an election to be held as prescribed in this statute "by persons appointed in the manner that persons are appointed for holding other elections in said county, township, city or town, and the returns thereof shall be made, and the results declared and certified as prescribed by law in such other elections." It is further provided by §14 of the same act, "That if the result of said election shall show that the majority of

the qualified voters of the said county, township, city or town favor subscription to the capital stock of the said railroad to. the amount voted for in such election, then said County Commissioners, or the proper authorities of said city or town, shall immediately make such subscription to the capital stock of said railroad, payable in cash or the bonds authorized to be issued under this act."

The charter of the City of Wilmington, the statute, (Acts 1876–'77, ch. 192, §§ 3, 5,) provides as follows:

SEC. 3. That before the first election of Aldermen to be held under the provisions of this act, and biennially thereafter before every such election, there shall be a new registration in each of the said wards of the persons qualified to vote in the same, and the first election for Aldermen shall be held on the fourth Thursday in March, one thousand eight hundred and seventy-seven, and subsequent elections therefor shall be held biennially thereafter on the fourth Thursday of March, of the respective years on which the same occurs.

SEC. 5. Every duly registered person in any ward, continuing to be a resident, *bona fide*, of such ward up to and on the day of any such election, shall be entitled to vote in such ward at any election therein, and no other person shall be entitled.

It appears, that in pursuance of application made to them as allowed by the provision of the charter of the railroad company above named, the Mayor and Aldermen, defendants, on the 5th of July, 1887, made an order whereof the following is a copy:

"Be it ordained by the Mayor and Board of Aldermen of the City of Wilmington, that an election be held on Thursday, the 11th day of August, 1887, at the usual polling places of the city, for the purpose of ascertaining the will of the qualified voters of this city upon the question of a subscription of $100,000 (one hundred thousand dollars) by the

city to the capital stock of the Wilmington, Onslow and
East Carolina Railroad Company. Every person qualified
on the day of election under existing laws, to vote for Al-
dermen of the City of Wilmington, shall be deemed a quali-
fied elector. All ballots must contain the words 'Subscrip-
tion' or 'No Subscription.' *That books be opened for a new
registration of the voters of the city at the following places,"* &c.:

It further appears, "That an entirely new registration of
voters was had according to the said ordinance, and on· the
day of election only sixteen hundred and seventy-six voters
had registered," and an election was held as therein directed.

It also appears, "That on the 12th day of August, 1887,
the said Board of Aldermen met and passed the following
resolutions, to-wit:

" WHEREAS, at an election held in this city on Thursday, the
11th day of August, 1887, in pursuance of an application of
the Wilmington, Onslow and East Carolina Railroad Com-
pany, and a petition of one-fifth of the qualified voters of
this city, and under an ordinance of the Mayor and Board
of Aldermen of this city on the question of a subscription of
one hundred thousand dollars to the capital stock of said
railroad company by this city, it is ascertained and hereby
declared, that at said election there were cast for subscrip-
tion 1,049· votes, against subscription 301 votes, and the
registration lists show an aggregate of 1,676 registered voters
in this city; therefore,

" *Resolved,* That the proposition has been adopted by a
majority of the registered voters of this city.

" *Resolved,* That the Finance Committee of the Board of
Aldermen are authorized to confer with the proper authori-
ties of the Wilmington, Onslow and East Carolina Railroad
Company, to the end that the conditions, terms and stipula-
tions contained in the letter of application of said company
by this Board shall be carried out, the bonds not to be de-

SMITH *v.* WILMINGTON.

livered except at the rate of twenty-five hundred dollars a mile as the road is completed mile by mile."

It further appears, " That the registration under which the election in question was held was 1,676, and there were cast for subscription 1,049, which is a majority of said registration, but is not a majority of the whole number of persons residing in the city, who, by law, were entitled to register and vote; on the fourth Monday of March, 1887, less than five months prior to the said election, an election was held according to law for aldermen of the said city, and that immediately before said election, and preparatory thereto, a new registration of the qualified voters of the said city was duly had according to the requirement of the third section of the Act of 1877, to organize a government for the City of Wilmington, above recited; and the number of qualified voters then registered was two thousand seven hundred and thirty-five, as appears by the registration books; that in the year 1880, preparatory to the general elections of that year, a registration of the qualified voters of New Hanover county was had, and the number of qualified voters then registered for Wilmington Township, which comprise precisely the same territory as the City of Wilmington, was four thousand two hundred and seventy-five, as appears by the said registry. And that since the year 1880 the population of the said city has been continually increasing."

The plaintiffs and other tax payers appeared before the Mayor and Aldermen on the 12th of August, 1887, when they declared the result of the election in question as above stated, and insisted that a majority of the qualified voters of the city had not voted in favor of "Subscription," and they protested against their action.

The plaintiffs in their complaint demand judgment:

" 1. That the said election held upon the 11th day of August, 1887, and all actings and doings under the same, be adjudged and declared to be null and void.

"2. That the defendants be perpetually enjoined and re-strained from making any subscription on the part of the City of Wilmington to the capital stock of the Wilmington, Onslow and East Carolina Railroad Company, and from issuing any bonds of the said city in payment of the same," and for general relief.

The facts stated above, including others not deemed material to an understanding of the opinion of the Court, were agreed upon by the parties, and submitted to the Court for its judgment.

Upon consideration, the Court "adjudged and decreed that the plaintiffs are not entitled to the relief asked for in the complaint, and that judgment be rendered against them for costs."

The plaintiffs appealed.

*Messrs. George Davis* and *T. N. Strange*, for plaintiffs.
*Mr. D. L. Russell*, for defendants.

MERRIMON, J., (after stating the case). It is not questioned, that in order to authorize the city of Wilmington, by its proper authorities, to subscribe for one hundred thousand dollars of the capital stock of the railroad company mentioned, the proposition to subscribe therefor must have received in its favor at the election in question, a majority of the votes of the qualified voters of that city.

By the terms "qualified voter" is implied, not simply that the person is eligible to be a voter, but as well and necessarily that he is registered as such in the way and manner prescribed by law.

A "qualified voter" is one duly registered. *Southerland* v. *Goldsboro*, 96 N. C., 49; *Duke* v. *Brown*, Ibid., 127; *McDowell* v. *The Construction Co.*, Ibid., 514; *Wood* v. *Oxford*, ·97 N. C., 227.

The registration of voters is essential and very important..

As was said in *McDowell* v. *The Construction Co., supra,* the purpose of it is, " to ascertain who is entitled to vote, and to facilitate the exercise of the elective franchise by citizens so entitled, and to prevent unlawful voting, fraud and confusion in all elections by the people." To render it effectual— to make it serve the purpose of the law—it must be made by the proper officers, in the way and manner and at the times prescribed by the law. The statutory regulations in such respects are not simply directory; they are in their substance mandatory as well; they do not imply discretion in those authorities charged with the execution of them, and moreover, to allow the exercise of such discretion in respect to a matter essential, affecting the rights of individuals and the public of great moment, might—would no doubt oftentimes—lead to private and public wrong, and serious confusion.

Whenever a person eligible to become a qualified voter, has been duly registered as such, he at once possesses the right to vote at all public elections as allowed by and at the time and place prescribed by law, until in some way he looses such right, and his right must be recognized and he must be treated and counted as a voter, whenever under and in pursuance of the law, it becomes necessary to have regard to him as such. Particularly, for the present purpose, he· cannot be required to re-register, or register a second time, at the same voting place, as a pre-requisite to the right to· vote then, unless the law allows or requires such re-registration. He continues to have the right to vote as a qualified voter and be treated as such in all respects, until he loses or is dispossessed of such right by virtue of the law, or as it· allows.

Now, applying what we have said, we are of opinion that· the election in question was ineffectual and void, because the Mayor and Aldemen had no authority to order a new registration of the voters of the City of Wilmington just before:

that election, as they undertook to do, ignoring and paying no regard to the regular registration of March of the present year, as they should have done, but, on the contrary, declaring in effect by their action, that the registered voters of the last mentioned registration could not vote at the election in August unless they registered anew, under their order. The election was held, the result thereof ascertained and declared—the whole based upon and having reference and regard only to the new registration mentioned. By it, there were at the election 1,676 registered voters. Of these 1,049 voted in favor of subscription, a large majority of the whole number of voters registered. But at the regular registration of voters in March of the present year, there were ·2,735 registered voters, and this does not include such persons as become eligible to register after that time. The regularly registered voters in the city in 1881 for the general election was 4,275. The facts tend strongly to show that the votes cast at the election in August was much short of a majority of the qualified voters, if regard be had to the regular registration in March last, and very far short of it if there had been a full registration. This is not denied.

The learned counsel of the appellees, in his able argument before us, contended that the Mayor and Aldermen had authority to order the new registration, and therefore, the election based upon it, and the result ascertained from reference to it, was valid.

We are very sure that this construction is not well founded and cannot be sustained. They derive their authority in respect to registration from the charter of the city; the charter of the railroad company·mentioned does not, nor does it purport, to enlarge it, further than, in the case provided for, to order an election and take such further action as the result of it may render necessary.

The city charter provides, " that before the first election of Aldermen to be held under the provisions of this act, and

*biennially thereafter, before every such election, there shall be a new registration in each of the said wards, of the persons qualified to vote in the same,"* &c.  Thus, and thus only, is the power to order or provide for a "new registration" conferred; it is plainly to be exercised biennially, and there are no words, phraseology, provision, or things required to be done, that imply, or from which it can be reasonably inferred, that new registrations at other times might be required to be made.

It was further insisted, that inasmuch as before the regular biennial city election, there must be a like new registration, one before the election in question, was necessary, because the charter of the railroad company named required that this election should be held "in the manner prescribed by law for holding other elections" in the city.  This is a misapprehension of the clause of the charter referred to.  It provides that "such election shall be held after thirty days' notice, specifying the amount of subscription to be voted for, and to what company it is proposed to subscribe, posted at the court house door and three other public places in said county, township, city or town, at the several voting places, and by persons appointed in the manner that persons are appointed for holding other elections in said county, township, city or town, and the returns thereof shall be made, and the results declared and certified, as prescribed by law in such other elections."  This, it seems to us, in plain terms, refers only to holding the election, ascertaining its result and certifying the same—not a word is used as implying or pointing to registration; the omission to mention or refer to it in some way, is singular, if the purpose was to require a new registration.  Registration is one thing—to hold the election, ascertain and certify the result, is essentially a very different one.  Registration precedes the holding of an election.  Such inference of authority is too remote and strained to be allowed, especially in the absence of necessity justifying it.  The admitted

facts go to show, that there was a total absence of necessity for such new registration; indeed, they more than hint at a purpose to take undue advantage of it by some persons friendly to the subscription.

It was also contended, that authority to order and require such new registration might be derived from the statute, (*The Code*, §2675,) which authorizes the board of county commissioners to direct a new registration of voters as prescribed, first giving thirty days' notice, &c.; and the statute, (*The Code*, §3795,) which requires the corporate authorities of every city and town to cause a registration to be made of all the qualified voters residing therein, "under the rules and regulations prescribed for registration of voters for general elections," and the statute, (*The Code*, §3827,) which makes the general statutory provisions as to "towns and cities" applicable to all incorporated cities and towns, when the same are not inconsistent with special acts of incorporation or special laws in reference thereto. This cannot be allowed. The Mayor and Aldermen did not profess to exercise authority thus derived—they did not direct that thirty days' notice be given of such new registration, nor does it appear that such notice was given—they simply ordered "that books be opened for a new registration of voters of the city" at places designated. It may well be questioned whether, if they had given proper notice, they could thus derive such authority, because the charter of the city expressly provides that new registration of voters shall be made biennially, but we need not decide this question, as the general statute was not observed—it does not so appear.

The registration of March, 1887, should have been scrutinized—purged of the names of persons who for any cause had ceased to be voters—and observed, and opportunity afforded to persons who became eligible to register and become qualified voters at the time of the election, and the

result of the election should have been ascertained by the number of qualified voters thus appearing.

Authority to provide for the registration of persons who become eligible as voters after the last preceding election, is given by the statute, (*The Code*, §§2675–3795.) As to this, there is no provision in the city charter, and hence, the general statutory provision cited, applies. *McDowell* v. *The Construction Co., supra; Perry* v. *Whittaker,* 71 N. C., 475.

There is error. The judgment must be reversed, and judgment declaring the election void and granting an injunction as prayed for in the complaint, entered in favor of the plaintiffs.

To that end let this opinion be certified to the Superior Court.

Reversed.

SMITH, C. J., dissenting. It is conceded that the election held on the 11th day of August, 1887, by the authority of the Mayor and Board of Aldermen of the City of Wilmington, was in all respects regular and in conformity with the provisions of the statute, except that a new registration of voters was both unnecessary and unauthorized, so that while upon the last registry, a majority of votes were cast in favor of the proposed subscription, upon the former there was not such majority. In one case the subscription was sustained; in the other rejected.

The city charter *commands* a biennial registration to be made just preceding the election of Aldermen, which is required to take place on the fourth Thursday in March, 1877, and for the alternate successive years thereafter, to meet and provide for changes that may take place in the interval, while it does not forbid other registrations, but rather indicates the propriety of them on occasions of deep and unusual interest, in which an expression of the popular will is to be ascertained upon an inquiry submitted. The phraseology

of section 13 of the charter of the road, seems intended to assimilate this in its general provisions to ordinary State and county elections, for it must be held "at the usual voting places and by *persons appointed in the manner* that persons are appointed for holding other elections in said county, township, city or town, and the returns thereof shall be made and the results declared and certified as *prescribed by law in such other elections."*

The general law regulating elections, (§2075 of *The Code*), gives express authority to the county commissioners to direct "an *entirely new registration of voters before any election,* instead of the revision of the registration list as above prescribed."

Registration, being preliminary and yet part of the process of taking a popular vote, seems to be contemplated in the references made in the referred to section of the incorporating act.

There is a propriety, moreover, in having a full and correct list of persons competent to vote on the eve of an election, so as to avoid the inconvenience and mischiefs of a purgation afterwards, as is seen in the case of *Rigsby .*v. *Durham,* decided at this Term, where a number short of a majority of the number on the registry, is made a majority by striking out the names of 180 voters and reducing them from 980 to 800.   It is far better to have the correction made before the election, by officers appointed to revise, and who have ample time to do so, instead of when the heat of the contest is felt, and efforts are made to reverse the result by the disappointed party.   Peculiarly must this frequent revision be made in a city so much of whose population have transient homes in the different wards.

The falling off in the registration may be ascribed to an indifference to the result, but for whatever cause it may happen, the result will be the same.   All have had an opportunity to register and thus secure the right to vote on the

pending proposal, and if they fail to do so, it is their own fault, and must be regarded as an acquiescence in the result. I am, therefore, of opinion that the ruling should be affirmed.