WEBER, PLAINTIFF, *v.* CITY OF HELENA ET AL., DEFENDANTS.

(No. 6,794.)

(Submitted January 2, 1931. Decided January 27, 1931.)

[297 Pac. 455.]

*Mr. E. G. Toomey,* for Plaintiff, submitted a brief and argued the cause orally.

*Mr. Raymond T. Nagle,* for Defendants, submitted an original and a supplemental brief and argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

Plaintiff, a resident taxpayer and registered elector of the city of Helena, on November 10, 1920, applied for an original writ to enjoin defendants from issuing and selling certain bonds. The petition of plaintiff discloses the following facts:

That on May 19, 1930, a petition signed by more than twenty per cent of the qualified, taxpaying, registered electors of the city of Helena, was presented to the city council requesting that an election be called for the purpose of submitting to the taxpayers the question of issuing bonds in the sum of $200,000 for the purpose of improving and making more efficient the water plant of the city of Helena. The petition was by resolution of the council declared sufficient. On June 9 the council passed an ordinance calling for an election and directed it

to be held on July 7. Notice of the election was published for a period not less than three weeks prior to the election in a newspaper in Helena, and copies were posted in not less than three public places in the city and one at each polling place, and nine in nine of the most public places in each ward, all for a period of not less than three weeks prior to the date of the election. On June 9 the city council appointed registry agents in each ward for the registration of electors to vote on the proposed bond issue, and directed that the registration be made on July 1 and 2. On June 27 notices designating the time when and place where registration would be conducted were posted at each registration place, and nine copies were posted in nine of the most prominent places in each ward, and the notice was published in the "Helena Daily Independent" for four consecutive days prior to the time provided for registration, all as provided in certain city ordinances. The registration agents in obedience to the provisions of the ordinances, required applicants to sign and swear to a statement that he or she had "paid taxes upon property owned by and assessed to" him or her "on the assessment-roll of the city * * * next preceding the election." Three applicants whose names appeared upon the assessment-roll for the preceding year, and who were qualified electors, declined to make the affidavit required, because it contained the statement that taxes assessed to them had been paid. Fourteen hundred and sixty-five persons registered under this plan of registration.

Each registry agent on the day following the registration posted in a conspicuous place in his ward, at the place where votes were received at the election thereafter held, a list of all persons registered at such registration. It is alleged that none of the proceedings provided for by sections 566, 567, Revised Codes of 1921, by Chapter 98, Laws of 1923 or by Chapter 47, Laws of 1929, were observed. Twenty-eight persons who had registered under the municipal plan had been found not to have paid taxes upon property assessed to them on the last preceding assessment-roll and were not permitted to vote, which

included plaintiff. The county clerk of Lewis and Clark county had kept and preserved registry books as required of him by law, and all of the persons who voted at the special election in question, except 51, were registered in the registry records of the county clerk on the forty-fifth day prior to the election; these 51 persons were permitted to vote and were not registered on the books of the county clerk, but had registered under the municipal registration and had paid taxes on property assessed on the last preceding assessment-roll. On the date of the election, and for forty-five days prior thereto there appeared the names of 2,512 persons upon the county registry books whose names appeared upon the assessment-roll of the county for the year preceding, assessed upon property within the city. Of this number, 1,047 persons did not register or attempt to register under the municipal registration and did not vote or attempt to vote at the election in question. At the time of the election, and forty-five days prior thereto, 128 of the persons otherwise qualified to vote had not paid the tax assessed against them on the assessment-roll next preceding the election, 32 of whom registered at the special election, and 4 of the 32 voted.

At the election of July 7, 573 votes were cast in favor of the bond issue, and 437 against it. Thereafter, and on July 28, an ordinance was passed providing for the issuance and sale of the bonds on September 2, at which time the bid of the state board of land commissioners, subject to the approval of the attorney general, was accepted. On September 16 an ordinance was passed providing for the form and manner of execution of the bonds. The attorney general has not approved the proceedings. It is alleged that unless enjoined from so doing, the defendants will sell the bonds, levy and collect taxes for the payment thereof, and collect water rents and charges therefor; the election proceedings are alleged to have been unlawful, illegal, and void for the following reasons:

1. That the registration for the election was not closed as provided by law.

2. That notice of closing registration for the election was not given thirty days before the closing, as required by law.

3. That lists of registered electors qualified to vote were not prepared by the county clerk and posted, as required by law.

4. That registered electors of the city whose names appeared upon the assessment-roll for the year next preceding the day of election were denied the right to vote because delinquent in the payment of taxes for such year.

5. That persons not registered as required by law were permitted to vote at the election.

Defendants filed an answer admitting all of the facts alleged in the petition, but denying the conclusions alleged with respect to the validity of the election. The answer alleges that not more than 28 persons, otherwise qualified to vote, applied and were denied the right to vote because they had not paid taxes, and that it is unknown how many of them would have voted for or against the bond issue; that not more than 51 persons who voted at the election were not registered on the books of the county clerk, and that it is unknown how many of them voted in favor of or against the bond issue; that out of the 128 persons, otherwise qualified to vote at the election but who had not paid their taxes, only 28 applied to vote and were denied the right; that it is unknown how many of the remaining persons, included in the 128, failed to apply to vote by reason of anticipation on their part that they would be denied the right to vote and that it is unknown how many of them would have voted in favor of or against the bond issue; that no elector qualified to vote was deprived of the right to do so by reason of having failed to register at the special registration; that the judges and clerks of election were instructed to permit, and did permit, any elector otherwise qualified to vote, who had failed to register at such registration, to be sworn in and to vote upon signing and swearing to the following affidavit: "I do solemnly swear that I am a citizen of the United States; that I am 21 years of age, and have resided in this state one year immediately preceding the approaching election; that I

have resided in the city of Helena for six months; that I am an actual resident of the —— precinct of said city and I now reside at —— street; that I have paid taxes upon property owned by and assessed to me on the assessment-roll of the City of Helena next preceding the election held ——.'' That this procedure was publicly known and was availed of by a number of electors, otherwise qualified but who had failed to register at the special registration; that no elector, otherwise qualified but who had failed to register at the special registration, declined to sign the affidavit because of its contents.

By way of separate defense, defendants allege that more than sixty days have elapsed since the passage of the ordinance authorizing the issuance and sale of the bonds and that the cause of action is barred by section 9040, Revised Codes 1921.

The plaintiff in his reply admits all of the facts alleged in the answer, but denies the conclusion that the cause of action is barred. The controversy is before us for final determination upon the foregoing conceded facts.

The first point of difference between the parties is whether Chapter 98, Laws of 1923, as amended by Chapter 47, Laws of 1929, or sections 5009, 5278 and 5279, Revised Codes 1921, govern the procedure to be followed for the registration of electors and determine their qualifications in an election on a proposal such as here involved.

Section 5278 provides: ''Whenever the council of any city or town, having a corporate existence in this state, or hereafter organized under the provisions of this title, shall deem it necessary to borrow money or contract indebtedness under its powers, as set forth in subdivision 64 of section 5039 of this code, or amendments thereto, the question of issuing bonds or contracting such indebtedness shall first be submitted to the qualified electors of such city or town in the manner hereinafter set forth; provided, that taxpayers only, as defined by section 544 of this code, shall be entitled to vote on questions concerning the construction, purchase, or securing of a water plant, water system, water supply, or sewerage system.''

Subdivision 64 of section 5039, referred to in section 5278, in dealing with the powers of the city or town council, confers authority "to contract an indebtedness on behalf of a city or town * * * by borrowing money or issuing bonds for the * * * construction of * * * waterworks * * * provided, that no money must be borrowed on bonds issued for the construction, purchase or securing of a water plant, water system, water supply, or sewerage system, until the proposition has been submitted to the vote of the taxpayers affected thereby of the city or town, and the majority vote cast in favor thereof. * * * "

Section 544, referred to in section 5278, provides: "The payment of a tax upon property by any person assessed therefor on a county or city assessment-roll next preceding the election at which a question is to be submitted to the vote of the taxpayers of the state, or to the vote of the taxpayers of such county or city or any subdivision thereof, constitutes such person a taxpayer at such election."

Section 5279 provides for giving notice of the election and contains this clause: "The council may provide by ordinance for the registration of the taxpayers or qualified electors of such city or town, and no person shall be entitled to register or vote as [at?] such election who is not a taxpayer or qualified elector as hereinbefore set forth."

Also, section 5009 provides: "The council must provide by ordinance for the registration of electors in any city or town, and may prohibit any person from voting at any election unless he has been registered; but such ordinance must not be in conflict with the general law providing for the registration of electors, and must not change the qualifications of electors except as in this title provided."

It is conceded that the city conducted the election in question in substantial conformity with these statutory provisions and, if they have application, the election must be declared valid and the bonds upheld. But the plaintiff contends that the scheme of conducting such elections has been superseded

by the plan provided for by Chapter 98, Laws of 1923, and Chapter 47, Laws of 1929, which require the registration of electors to be conducted by the county clerk, and that, since these statutory provisions were ignored, the election cannot be upheld.

Prior to the passage of Chapter 98, this court had before it Chapter 74 of the Laws of 1913, in *State ex rel. Kehoe* v. *Stromme*, 49 Mont. 25, 139 Pac. 1002, 1003, and in speaking of it said: "Its obvious purpose is to provide a scheme for perpetual registration suitable to all elections under all conditions, and the amendments consist largely in making the various provisions applicable to special as well as to general elections." The statute there involved, corresponding to what is now section 566, Revised Codes 1921, expressly related to special as well as general elections.

The 1913 laws were amended by Chapter 122, Laws of 1915, and in the section corresponding to what is now section 566 no reference was made to special elections, but it was specifically provided by section 32 of Chapter 122, which is now section 582, Revised Codes 1921, that "the word 'election' as used in this law where not otherwise qualified, shall be taken to apply to general, special, primary nominating, and municipal elections, and to elections in school districts of the first class." Thus the legislature clearly intended to adhere to its policy commented upon in *State ex rel. Kehoe* v. *Stromme,* supra. Further evidence of that fact is found, we think, in Chapter 98, Laws of 1923, and Chapter 47, Laws of 1929, which require the registration of electors to be conducted by the county clerk.

Section 1 of Chapter 98 provides: "That from and after the passage and approval of this Act, only such registered electors of the *state, county,* city, town, school district, or other municipal corporation, whose names appear upon the last preceding assessment-roll shall be entitled to vote upon any proposal to create or increase any indebtedness of *state, county,* city, town, school district or other municipal corporation, required by law to be submitted to a vote of the electors thereof."

Section 2 provides: "The county clerk shall, immediately after the closing of the registration books of his county preceding such election, as provided by law, prepare lists of the registered electors of the *county*, city, town, school district or other municipal corporation whose names appear upon the last preceding assessment-roll, and shall prepare poll-books therefor as provided by Section 568, Revised Codes of Montana of 1921, and furnish copies thereof to the city, town, school district or municipal corporation in which such election is to be held for which he shall receive compensation as provided in Section 571, Revised Codes of Montana of 1921. *Whenever the election is upon a proposal to create or increase the debt of the state or of a county, the County Clerk shall post lists of such electors as provided in Section 567, Revised Codes of Montana of 1921.* When the election is upon a proposal to create or increase the indebtedness of a city, town, school district or other municipal corporation, the County Clerk shall deliver such lists to the clerk of the city, town, school district or other municipal corporation, holding such election, and it shall be his duty to post such lists in the manner provided in said Section 567. *Provided, however, that nothing in this Act contained shall apply to or affect any such election called at the time of the passage and approval hereof.*"

By Chapter 47, Laws of 1929, Chapter 98 was amended so as to eliminate the portions in italics. In legal effect, Chapter 47 simply continued in effect without change the provisions of Chapter 98 in so far as the latter has to do with cities, towns, school districts, and other municipal corporations. (*Snidow* v. *Montana Home for the Aged*, 88 Mont. 337, 292 Pac. 722.) Whether section 582 is sufficiently broad to require registration under section 566 for an election on a proposal such as we have before us need not now be determined. It is clear that Chapter 47 so requires.

Reduced to final analysis, the contention of the city is that the clause "required by law to be submitted to a vote of the electors thereof," appearing in section 1 of Chapter 47, relates

to proposals required to be submitted to all electors and that the purpose of the Act was to require such proposals to thereafter be submitted to registered taxpaying electors, and that it has no effect upon such proposals which by existing law were required to be submitted to taxpayers as distiguished from electors. If this were the correct meaning to be ascribed to the Chapter, then, so far as it relates to cities, towns, and school districts, it would be meaningless, for there could be no situation to which it could apply as to them. This for the reason that section 1253, Revised Codes 1921, which was already in effect at the time Chapter 98 was enacted, provided: "In all elections hereafter held for the issuance of bonds of any school district, town or city, only qualified registered electors who are taxpayers upon property therein, and whose names appear on the assessment-roll for the year next preceding such election, shall be entitled to vote thereat." If, as the city contends, Chapter 47 has to do only with proposals to create or increase an indebtedness requiring the approval of the electors, then as to cities, towns, and school districts it would be wholly inoperative because existing laws required the assent of the taxpayers, not electors. We cannot assume that the legislature by the enactment of Chapters 98 and 47 sought to do an idle thing. We think the evident purpose of the Act was to provide the procedure for all elections to increase or create the indebtedness of the political units therein mentioned whenever the laws required the approval of electors, as distinguished from the executive officers of the political subdivisions named.

What effect Chapter 98 may have had upon state or county bonds need not here be determined, but it is worthy of note that by Chapter 84, Laws of 1925, refunding bonds were required to have the approval of the electors of the county, while Chapter 99 of the Laws of 1925 required approval of the electors "qualified as provided in Chapter 98, Session Laws of 1923." Whether because of the uncertainty of the effect of these two statutes passed at the same session, or whether because of apprehension of the validity of Chapter 98 as applied

to the state and counties as intimated in *State ex rel. Henderson* v. *Dawson County,* 87 Mont. 122, 286 Pac. 125, it is apparent that county bonds were issued, in some cases at least, without reference to Chapter 98, Laws of 1923, for the legislature passed Chapter 56, Laws of 1927, and Chapter 153, Laws of 1929, for the purpose of validating county bonds which had been authorized by the electors, rather than the registered taxpayers "as required by Chapter 98 of the Laws of 1923," and then by Chapter 47, Laws of 1929, eliminated the state and counties from the operation of Chapter 98.

The city further contends that sections 5278 and 5279 are special statutes relating to water bond elections and as such are unaffected by Chapter 47. Reliance is had upon the general rule stated in 36 Cyc. 1092, that "an Act, special in its nature, and applying only to a particular class of elections, is not repealed by a general election law, unless an intent so to do is plainly manifested."

Conceding that sections 5278 and 5279 are special statutes, the rule above quoted has no application here, since Chapter 47, is not a general election law. It relates to special elections only. Sections 5278 and 5279 cover all proposals to borrow money or contract indebtedness for any of the purposes set forth in subdivision 64 of section 5039. The provisions of section 5279 authorizing the city to provide by ordinance for the registration of taxpayers, are not limited specially to water bond elections, but embrace every election required by subdivision 64 to be submitted to the taxpayers affected thereby. Chapter 47 covers the same matters. It relates to all proposals requiring the approval of qualified electors and repeals all Acts in conflict with it.

"When two statutes cover, in whole or in part, the same subject matter, and are not absolutely irreconcilable, no purpose of repeal being clearly shown, the court, if possible, will give effect to both. Where, however, a later Act covers the whole subject of the earlier Acts and embraces new provisions, and plainly shows that it was intended, not only as a substitute for

the earlier Acts, but to cover the whole subject then considered by the legislature, and to prescribe the only rules in respect thereto, it operates as a repeal of all former statutes relating to such subject matter, even if the former Acts are not in all respects repugnant to the new Act.'' (36 Cyc. 1077, 1078.)

If Chapter 47 should be held not to apply to water bond elections of the city and other elections provided for by subdivision 64, section 5039, then there are no elections of the city to which it can apply. Subdivision 64 enumerates the only matters that must be submitted to qualified electors relating to the subject of creating or increasing the indebtedness of a city.

We think it was the intention of the legislature that Chapter 47 should apply to all proposals to create or increase the indebtedness of a city where the approval of qualified electors is required and that it embraces water bond elections. To the extent that it conflicts with sections 5009, 5278 and 5279, the latter sections are repealed by implication. In so far as section 5279 provides for giving notice of such election we think it is unaffected by Chapter 47 and is still controlling.

By reference to sections 567, 568 and 571, in Chapter 47, these sections are to be considered incorporated in that Chapter (*State ex rel. Hahn* v. *District Court*, 83 Mont. 400, 272 Pac. 525; *Gustafson* v. *Hammond Irr. Dist.*, 87 Mont. 217, 287 Pac. 640), and are controlling in an election on proposals to create or increase the indebtedness of a city.

The city contends that if Chapter 47 has application to an election on a proposal such as the one involved here, the election must still be upheld and the bonds declared valid. The argument of counsel for the city is that while Chapter 47 might have been held mandatory before election it must now, after election, be held to be directory merely. This distinction in a proper case has been recognized by this court in *Potter* v. *Furnish*, 46 Mont. 391, 128 Pac. 542, 543, in *State ex rel. Hay* v. *Alderson*, 49 Mont. 387, Ann. Cas. 1916B, 39, 142 Pac. 210, and other cases. In *Potter* v. *Furnish* the statute under consideration provided that for an election such as there involved,

the official register and check list used at the last preceding general election must be used and that no new registration need be made. The act was assailed as unconstitutional because it did not afford opportunity for those becoming eligible to vote since the close of registration for the last preceding election to register and participate in the special election. The court pointed out that the "record fails to disclose that, if there were such qualified electors denied the right to vote, the number was sufficient to change the result, even assuming that all such would have voted against some or all of the propositions submitted at this election." The court further said: "It is a rule of well-nigh uniform recognition that, after an election has been held, a party will not be permitted to challenge it unless he can show that a different result would have been reached but for the conditions of which he complains." It is this statement that counsel for the city relies upon in support of his contention that the bond issue should be upheld. But the difficulty that confronts us is to determine whether in fact an election has been held.

Under Chapter 47 it is made the duty of the county clerk, immediately after the closing of the registration books of his county preceding such election, as provided by law, to prepare lists of the registered electors of the city "whose names appear upon the last preceding assessment-roll." The only statute requiring the closing of the registration books by the county clerk is section 566. Obviously, by section 2 of the Chapter it was intended to adopt section 566, as the controlling statute governing registrations in the elections held under Chapter 47. In consequence, to carry out the duties prescribed by section 2 of Chapter 47 to be performed by the county clerk, it is necessary that resort be had to section 566. This requires that registration shall close for the full period of forty-five days before the election and requires the county clerk to publish and post notice of the closing of registration for thirty days before its closing. It clearly requires that proceedings looking to the

registration of voters for any election shall be initiated at least seventy-five days before the election.

If the legislature deems it necessary that seventy-five days shall elapse between the time of giving notice of the closing of registration and the date of the election, we have no right to interfere with its determination. It is worthy of note that by section 12 of Chapter 147, Laws of 1927, the notice of closing registration was shortened substantially as to school districts of the first class, but whether the provisions therein made have been repealed by implication by Chapter 47, Laws of 1929, may present a serious question. As applied to cities, there has been no effort to shorten the time that must elapse under section 566 between the giving of the notice of the closing of the registration books and the date of election. To aid the county clerk in the performance of the duty of preparing the lists of registered electors, the city council is required by section 547 to certify to the county clerk a description of the boundaries of the several wards of the city, and under section 549 shall deliver to him a map correctly showing the boundaries of the wards of the city.

By Chapter 47 the county clerk is required to prepare pollbooks as provided in section 568 and furnish copies thereof to the city. It is made the duty of the city clerk to post the lists as provided in section 567. Under that section the lists must be posted not less than thirty days before election. This posting of the required list was admittedly not done in this election. In fact none of the requirements of the Chapter were observed.

Furthermore, from the context of Chapter 47 it is clear that all registered electors whose names appear upon the last preceding assessment-roll shall be entitled to vote, irrespective of whether they have actually paid their taxes. Since that Chapter repeals section 5278 by implication to the extent above noted, it also supersedes section 544 to which section 5278 makes reference, in so far as elections for the purposes specified in it are concerned. The city had no authority to require

payment of taxes as a condition to the right of an elector to vote when otherwise qualified under Chapter 47.

Can it be said that an election has been held when the controlling statute in all its particulars has been ignored? This is not a case where there has been a substantial compliance with statutory requirements, as was the case in *State ex rel. Hay* v. *Alderson,* 49 Mont. 387, Ann. Cas. 1916B, 39, 142 Pac. 210, and *State ex rel. Patterson* v. *Lentz,* 50 Mont. 322, 146 Pac. 932. We are not confronted with a situation where those conducting an election have departed from the strict letter of the law in some minor details, as in *Harrington* v. *Crichton,* 53 Mont. 388, 164 Pac. 537; *State ex rel. Nelson* v. *Timmons,* 57 Mont. 602, 189 Pac. 871; *Thompson* v. *Chapin,* 64 Mont. 376, 209 Pac. 1060, and other cases. It is not a case presenting mere irregularities in the proceedings leading up to the election. The attack is not alone upon the ground that the registration was improper or defective, nor is it a contest between candidates both of whom affirm the election—one or the other of which propositions is illustrated in *Parker* v. *Clatsop County,* 69 Or. 62, 138 Pac. 239, *Wiley* v. *Reasoner,* 69 Or. 103, 138 Pac. 250, *Huffaker* v. *Edgington,* 30 Ida. 179, 163 Pac. 793, *Potter* v. *Furnish,* supra, and *Reid* v. *Lincoln County,* 46 Mont. 31, 125 Pac. 429. Here, in addition to the failure to follow the law relating to registration, there was a failure to post the lists of registered electors as required by law, which contained the names of 2,512 persons, without considering others who might have registered had the required thirty days' notice been given as provided in section 566. Coupled with the failure to post the proper lists, there was an actual posting of a partial unauthorized list containing the names of 1,465 persons only, which could have no other effect than to direct attention to the 1,047 persons whose names did not appear on the posted lists, that they would not be permitted to vote and thus to give misleading information to the electors as to who would be permitted to vote at the election. In consequence, it presents a situation different from that involved in *Soper* v.

*County of Sibley*, 46 Minn. 274, 48 N. W. 1112, which had to do with the failure to post any list.

The situation here is much like that presented to the court in *State ex rel. Kehoe* v. *Stromme*, 49 Mont. 25, 139 Pac. 1002, and while the court pointed out in that case that the objection was being raised before election, it does not follow that the same conclusion would not have been reached had the attack come after the pretended election. This case falls within the exception recognized in *Goodell* v. *Judith Basin County*, 70 Mont. 222, 224 Pac. 1110, 1116, where the court adopted the following rule from *Jones* v. *State*, 153 Ind. 440, 55 N. E. 229: "All provisions of the election law are mandatory if enforcement is sought before election in a direct proceeding for that purpose; but, after election, all should be held directory only, in support of the result, unless of a character to effect an obstruction to the free and intelligent casting of the vote, or to the ascertainment of the result, or unless the provisions affect an essential element of the election, or unless it is expressly declared by the statute that the particular act is essential to the validity of an election, or that its omission shall render it void."

The attack here is upon the ground that the entire election was invalid because of the failure to make any attempt to comply with applicable statutes. Our election statutes particularly in so far as they require registration of electors, posting of the lists, and the like, were designed to insure purity of elections and as a protection against fraud. The legislature has determined that registration for an election to vote upon a proposal such as is involved here shall be conducted by the county clerk. It has determined that the list shall be posted not less than thirty days before the election. This was to afford an opportunity before election to challenge the right of an elector to register. (Sec. 573, Rev. Codes 1921.) For this court to now say that these statutory requirements need not be observed, or that they are merely directory, and that an election is as good and valid without compliance with any part of them, as by their observance, would be to defeat the will of the legislature.

As stated above, these requirements were made to safeguard against frauds and to afford facilities for the detection of illegal registration. This being so, can it be that the question of their observance is a matter of indifference and that an election conducted in entire disregard of the legislative requirements must, after election, be declared as valid to all intents and purposes as one which complied with the law? We think not. The fact that the city proceeded in good faith and in the belief that sections 5278 et seq. were controlling we think is of no importance. And the fact that no fraud was shown and that no proof had been adduced that a different result would have been obtained had the statute been complied with does not affect the question here considered. If these were the proper criteria by which to judge the validity of an election conducted in absolute disregard of applicable law, then it would be of no consequence what regulations the legislature might prescribe, so long as the complaining party was unable to make proof that the result achieved by the unauthorized method adopted would have been different if the law had been observed. We will not give sanction to such a rule.

The supreme court of North Carolina, in *Smith* v. *City of Wilmington*, 98 N. C. 343, 4 S. E. 489, declared an election ineffectual and void which was open to substantially the same infirmities which have been shown here.

We think the election in question cannot be sustained and that the attorney general properly withheld his approval of the bonds.

It remains to determine whether this action is barred by section 9040. That section provides: "No action can be brought for the purpose of restraining the issuance and sale of bonds by any school district, county, city, or town in the state of Montana, or for the purpose of restraining the levy and collection of taxes for the payment of such bonds, after the expiration of sixty days from the date of the order authorizing the issuance and sale of such bonds, on account of any defect, irregularity, or informality in giving notice, or in holding the

election upon the question of such bond issue." This statute by its terms has to do with "defects," irregularities, and informalities, in giving notice and in holding the election. It was evidently intended to apply wherever there has been departure from the statutory method of holding an election, only in minor details constituting irregularities or informalities (see *Fitzmaurice* v. *Willis*, 20 N. D. 372, 127 N. W. 95), and has no application where there was no attempt to comply with the statutes. Thus, in *City of Tampa* v. *Palmer*, 89 Fla. 514, 105 South. 115, it was held that the word "irregularity" is not synonymous with either the words "illegal" or "unlawful" and that it "contemplates only bona fide and unintentional mistakes on the part of ministerial or administrative officers in the performance of their duties and does not extend to or embrace instances where essential provisions of law have been violated or ignored." The action is not barred by section 9040.

The writ will issue as prayed for.

ASSOCIATE JUSTICES GALEN, FORD and MATTHEWS concur.

MR. CHIEF JUSTICE CALLAWAY, Concurring: The foregoing opinion demonstrates that the election respecting the issuance of bonds to better the Capital City's water system cannot be upheld. It also demonstrates the deplorable statutory condition. We find that statutes, apparently controlling the procedure for holding elections upon matters vital to the health and safety of the people of a city, have been repealed by implication. The meaning of other statutes which, it seems, must be followed, is obscure. Can it be possible that the legislature intended that at least seventy-five days should elapse after the city authorities have determined to hold an election upon a question of such paramount importance, before the election can be held? The law as it is written compels the conclusion we have reached. The hope is entertained that the exhaustive opinion written by Mr. Justice ANGSTMAN, in which all the members of the court concur will serve to clarify this particular subject.

The taxpayers' money spent in holding the election has been wasted. But in view of the condition of the statutes, as shown in the opinion, whoso essays to condemn the city authorities for the course they pursued will indeed be censorious.

This court is confronted continually with obscure and conflicting statutes. This case is but one of many which furnish an irrefutable argument demonstrating the necessity—in the interest of economy if nothing else—for a revision of our statutory law.

---

## OPINION ON MOTION TO DISSOLVE INJUNCTION.

(Motion submitted March 2, 1931. Decided March 19, 1931.)

[297 Pac. 464.]

*Mr. Raymond T. Nagle,* for Defendants, submitted an original and a reply brief and argued the motion orally.

132

*Mr. E. G. Toomey,* for Plaintiff, filed a brief in resistance of the motion for dissolution of the injunction and argued the question orally.

134

136

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

This is a motion to dissolve the injunction issued upon our order in this cause, pursuant to the opinion handed down on January 27 of this year.

Thereafter the legislature, then being in session, passed, and the governor approved, House Bill No. 221 (Chap. 51, Laws of 1931), which is a general law providing: "That any election heretofore held for the purpose of authorizing any city of the State of Montana to create or increase the indebtedness of such city, not exceeding three per centum (3%) of the value of the taxable property of such city, by issuing bonds for any of the purposes set forth in subdivision 64 of section 5039, R. C. M. 1921, as amended, which election was held after notice stating the time and place of holding the election, the amount and character of the bonds proposed to be issued and the purpose thereof, was published and posted for the time and in the manner required by section 5279, R. C. M. 1921, and at which election the proposal to increase said indebtedness and to issue such bonds received a majority of all votes tendered and of the votes cast at such election upon such proposition, be, and the same is hereby legalized, ratified, confirmed and declared valid to all intents and purposes, and all such bonds whether issued or hereafter to be issued are legalized and declared to be valid and legal obligations of and against the city issuing the same regardless of any error, defect, omission, irregularity or departure from statute in the holding or conduct of such election, or registration therefor, or in any of the steps or proceedings relating thereto."

The question for determination is whether the legislature had the power to enact the law and, if so, whether it validated the election.

In considering the force of the Act we bear in mind the familiar rule that every statute enacted by the legislature is presumed to be the result of the exercise of its consti-

tutional right to enact it, and every reasonable doubt must be resolved in favor of legislative action. (*State ex rel. Diederichs v. State Highway Commission*, 89 Mont. 205, 296 Pac. 1033; *State ex rel. Public Service Commission v. Brannon*, 86 Mont. 200, 67 A. L. R. 1020, 283 Pac. 202; *State ex rel. Stephens v. Keaster*, 82 Mont. 126, 266 Pac. 387.)

"The control of *remedies*, exercised by the enactment of laws to cure defects in previous statutes, or to supply former omissions and legalize past acts, is one of the most essential of legislative powers." (Wade on Retroactive Law, sec. 250; *Snidow v. Montana Home for the Aged*, 88 Mont. 337, 292 Pac. 722; *Scilley v. Red Lodge-Rosebud Irr. Dist.*, 83 Mont. 282, 272 Pac. 543.)

In the absence of special constitutional restrictions the competency of the legislature to enact retrospective statutes to validate an irregular or defective execution of a power by municipal corporations is undoubted. (Dillon on Municipal Corporations, 5th ed., sec. 948.)

The rule applicable to cases of this description, phrased by the eminent Judge Cooley, is a legal classic: "If the thing wanting or which failed to be done, and which constituted the defect in the proceedings, is something, the necessity for which the legislature might have dispensed with by prior statute, then it is not beyond the power of the legislature to dispense with it by subsequent statute." (Cooley's Constitutional Limitations, 8th ed., p. 775. Quoted with approval in *Lamont v. Vinger*, 61 Mont. 530, 202 Pac. 769; *Scilley v. Red Lodge-Rosebud Irr. Dist.*, supra.)

Confessing the force of the foregoing principles it is argued that the election which is the subject of this inquiry cannot be cured, because it was void, and the fact is cited that in the opinion we said, "there was no election." But we said also that there was an election—the record discloses that the public evinced strong interest in it—and we recited in some detail the methods employed by the city authorities in holding it. Because statutory requirements were disregarded the election was

void: there was no *legal* election, and nothing more than that was meant by anything said in the opinion.

Mr. Gray in his work on the Limitations of the Taxing Power and Public Indebtedness, section 1251 et seq., draws an important distinction between "jurisdictional" defects and "jurisdictional" requirements, which he places in two classes. In the first, any material act which the legislature, in laying down rules of conduct for officers, has made it necessary that they shall do, is a jurisdictional act so far as the officers are concerned, because the legislature has made it obligatory upon them. "Though jurisdictional as to officers, they are not jurisdictional as to the legislature, and the familiar principle that an act which the legislature could have dispensed with at first it can dispense with by a curative Act, operates." The second class of jurisdictional acts are those which are jurisdictional to the legislature itself—those things which must be done because the people in written Constitutions or in inherent restraints upon legislative power have made essential. These the legislature cannot validate.

Upon an examination of the facts and the law applicable thereto, it is seen that the validating Act in question falls within the first class.

The defect in the proceedings leading up to the election which was held in the city of Helena on July 7, 1930, which caused us to declare the election invalid, was that the city council followed the provisions of sections 5009, 5278 and 5279, Revised Codes 1921, rather than the controlling provisions of Chapter 98 of the Laws of 1923, as amended by Chapter 47 of the Laws of 1929. The defects consisted in failing to obtain from the county clerk lists of voters registered under the state law and failing to post such lists for the period required by law. It is not necessary to decide whether the legislature might have dispensed with an election altogether. It is clear that by general law it might have authorized cities to provide all the methods necessary to the holding of elections therein for municipal purposes, as it did in 1897 by enacting the statutes which

appear in the Revised Codes of 1921 as sections 5278 and 5279. The legislature could have dispensed with the registration of electors altogether, as it did prior to 1915 (Chap. 122, Sess. Laws 1915, p. 263) or, perhaps, 1911 (*State ex rel. Kehoe* v. *Stromme*, 49 Mont. 25, 139 Pac. 1002).

In *State ex rel. Board of Education* v. *Brown*, 97 Minn. 402, 5. L. R. A. (n. s.) 327, 106 N. W. 477, it appeared that the city of Minneapolis submitted to the voters two propositions for the issuance of school bonds, but neither of the propositions received a two-thirds majority of all the legal voters present and voting at the election, as required by the laws of Minnesota. The legislature passed two Acts validating the bonds. The supreme court said: "The whole matter was under the control of the legislature. The bonds could only be issued by its authority and upon the terms by it prescribed. It could impose or waive conditions; it could ratify what it could at the time authorize."

In a South Carolina case where the registration books were not open or closed within the time provided by law, nor was the notice of election published for the length of time required by law, the legislature passed a curative Act validating the election, which the supreme court held authorized the issuance of the bonds in question. (*Lucas* v. *Barringer*, 120 S. C. 68, 112 S. E. 746.)

In *City of Venice* v. *Lawrence*, 24 Cal. App. 350, 141 Pac. 406, a case in which an Act validating city bonds was at issue, Mr. Justice Shaw said: "It has been repeatedly held that the legislature may validate past transactions when it could in advance, without contravening constitutional provisions, have authorized the proceedings taken as a precedent condition to the exercise of municipal power in issuing bonds. In other words, as to all steps which the legislature could, in the first instance, have dispensed with, it may by retroactive statute declare the taking thereof unnecessary.. (See 2 Dillon on Municipal Corporations, 5th ed., sec. 948; *City of Redlands* v. *Brook*, 151 Cal. 474, 91 Pac. 150.)" To which we add *Middle-*

*ton* v. *City of St. Augustine,* 42 Fla. 287, 89 Am. St. Rep. 227, 29 South. 421; *Griffith* v. *City of Vicksburg,* 102 Miss. 1, 58 South. 781; *Rogers* v. *City of Keokuk,* 154 U. S. 546, 18 L. Ed. 74, 14 Sup. Ct. Rep. 1162; McQuillin on Municipal Corporations, 2d ed., sec. 2469.

"Even where there was no authority for the issue of bonds by a municipal corporation, the legislature may subsequently ratify and validate whatever it might constitutionally have authorized in the first instance." (44 C. J. 1230; *Utter* v. *Franklin,* 172 U. S. 416, 43 L. Ed. 498, 19 Sup. Ct. Rep. 183; *Steele County* v. *Erskine,* 98 Fed. 215, 39 C. C. A. 173. Compare *State ex rel. Northwestern Nat. Bank* v. *Dickerman,* 16 Mont. 278, 40 Pac. 698; *In re Pomeroy,* 51 Mont. 119, 151 Pac. 333; *State ex rel. Lockwood* v. *Tyler,* 64 Mont. 124, 208 Pac. 1081; *Spear* v. *Bremerton,* 95 Wash. 264, 163 Pac. 741.)

"The fact that this court has held the original Pima County bonds invalid does not affect the question. They were invalid because there was no power to issue them. They were made valid by such power being subsequently given, and it makes no possible difference that they had been declared to be void under the power originally given. The judgment in that case was *res adjudicata* only of the issues then presented, of the facts as they then appeared, and of the legislation then existing." (*Utter* v. *Franklin,* supra.)

*Steele County* v. *Erskine,* supra, was a case before the circuit court of appeals of the eighth circuit, Circuit Judges Caldwell, Sanborn and Thayer, sitting, in which an opinion by Judge Amidon was adopted. It was argued that a curative Act of the legislature was an infringement upon the judicial power, for the reason that the supreme court of North Dakota (*Erskine* v. *Steele County,* 4 N. D. 339, 28 L. R. A. 645, 60 N. W. 1050), had held that the county commissioners of Steele county had no power or authority under the law to enter into the contract described in the opinion. The legislature by general law had passed a curative Act which supplied the want of power. Judge Amidon said: "The act of a municipality, done

without authority previously conferred, may be confirmed and legalized by subsequent legislative enactment, when legislation of that character is not prohibited by the Constitution, and when that which was done would have been legal had it been done under legislative sanction previously given. (*Grenade County* v. *Brown* (*Brogden*), 112 U. S. 261, 28 L. Ed. 704, 5 Sup. Ct. Rep. 125; *Bolles* v. *Brimfield*, 120 U. S. 759, 760, 30 L. Ed. 786, 7 Sup. Ct. Rep. 736; *Springfield Safe-Deposit & Trust Co.* v. *City of Attica*, 85 Fed. 387, 29 C. C. A. 214.) The objection that the Act in question was judicial legislation wholly misconceives the nature of the Act. The legislature did not declare the contract valid which the court had adjudged invalid, but made it valid by imparting to it the legislative sanction which the court had declared was the only element wanting to its validity. The Act did not construe, but completed, the imperfect contract which the county had made. * * * The want of power in a municipal corporation to enter into a contract is usually disclosed for the first time by an adverse decision in the courts, and, if it should be held that such a decision precludes the legislature from curing the defect, retroactive legislation would be defeated in those cases in which it has heretofore been most frequently used, and in which it has its highest justification. Such is not the law."

That the election in question comes within the provisions of the Act is beyond doubt. The facts recited taken in connection with those stated in the original opinion in this case and in connection with the language of the Act, warrant the statement. Nevertheless, House Bill 221 is not a special law within the contemplation of section 26 of Article V of the Constitution. No matter what may have impelled the legislative action, the law is a general one relating to all cities of Montana coming within its terms. (*City of Redlands* v. *Brook*, supra; *Kennedy* v. *Meyer*, 259 Pa. St. 306, 103 Atl. 44.)

"It is settled by the decisions of this court cited above and by the courts of other states, that curative statutes or remedial Acts which apply to all places, things or subjects which are

affected by the conditions which are to be remedied are not special Acts within the meaning of the constitutional prohibitions. Innumerable Acts of this character appear in the statute books." (*State ex rel. Board of Education of the City of Minneapolis* v. *Brown,* 97 Minn. 402, 5 L. R. A. (n. s.) 327, 106 N. W. 477.)

The ordinances authorizing the election, and the bonds proposed to be issued, pledge the credit of the city and the revenues of the water department for the payment of the bonds. Counsel for plaintiff argues that while the city proposes to pay off the bonds with the revenues from the water plant, yet the proceedings exhibit the fact that a tax may be levied to pay the same. (*Carlson* v. *City of Helena,* 39 Mont. 82, 17 Ann. Cas. 1233, 102 Pac. 39.)

Relying upon decisions of the supreme court of Illinois, mentioned hereafter, counsel for plaintiff argues that because it is possible to levy a tax to pay the bonds, the Act validating the election is equivalent to the direct imposition of taxes, which is prohibited by section 4 of Article XII of the Constitution, which reads: "The legislative assembly shall not levy taxes upon the inhabitants or property in any county, city, town, or municipal corporation for county, town or municipal purposes, but it may by law invest in the corporate authorities thereof powers to assess and collect taxes for such purposes." The words "corporate authorities" as used in this section mean those municipal officers who are either directly elected by the inhabitants of the municipalities or are appointed in some mode to which they have given their consent. (*State ex rel. Gerry* v. *Edwards,* 42 Mont. 135, Ann. Cas. 1912A, 1063, 32 L. R. A. (n. s.) 1078, 111 Pac. 734.)

The exaction by the city of Helena of a water rental from its inhabitants is not a levy of taxes upon the inhabitants and does not contravene the provisions of section 4, Article XII, supra, for a water rental is not a tax. (*Public Service Commission* v. *City of Helena,* 52 Mont. 527, 159 Pac. 24.) But should the city see fit to levy taxes for the payment of the

bonds, the Act does not contravene the Constitution. It seems clear to us that the constitutional provision means just what it says,—that the legislature shall not *levy* taxes upon cities for city purposes but may by law invest in the corporate authorities power to assess and collect taxes for such purposes. (*Owings* v. *City of Olympia*, 88 Wash. 289, 152 Pac. 1019.)

The state of Washington has a constitutional provision similar to our section 4. In *Baker* v. *Seattle*, 2 Wash. 576, 27 Pac. 462, the court refused to follow Illinois. Later decisions of the Washington court have followed the doctrine of *Baker* v. *Seattle*. (*Owings* v. *City of Olympia*, supra, and cases cited.)

A Florida case, *Potter* v. *Lainhart*, 44 Fla. 647, 33 South. 251, grew out of an Act of the legislature which undertook to validate bonds issued pursuant to an election and alleged to be void. Among other objections to the validity of the Act it was urged that it was in conflict with section 5 of Article IX of the Constitution of Florida, which provides that the "legislature shall authorize the several counties and incorporated cities or towns in the state to assess and impose taxes for county and municipal purposes, and for no other purposes." There, as here, the plaintiff relied upon the Illinois decisions but the court refused to follow them. Speaking of the validating Act the court said: "It undertakes to confer no new powers nor to impose any new duties, but simply to validate irregularities in the execution of granted powers, and the accomplishment of this is not the arbitrary imposition of a debt against the county."

In Illinois it is said that the validation of a bond issue by granting the power to the municipality after the municipality has attempted to exercise it amounts to the imposition of a debt by the legislature which is forbidden by constitutional provisions somewhat similar to section 4 of Article XII of our Constitution. Upon this point early cases in that state (*Cowgill* v. *Long*, 15 Ill. 202; *Schofield* v. *Watkins*, 22 Ill. 66; *Keithsburg* v. *Frick*, 34 Ill. 405) do not seem to be in harmony with *Marshall* v. *Silliman*, 61 Ill. 218, *Wiley* v. *Silliman*, 62 Ill. 170, and

later cases, some of which are cited in counsel's brief, two of which are *Cornell* v. *People*, 107 Ill. 372; *People ex rel. Stevenson* v. *Illinois Central R. R. Co.*, 310 Ill. 212, 141 N. E. 822.

The *Silliman Cases*, which related to bond issues in favor of a railroad, came before the United States supreme court in *Township of Elmwood* v. *Marcy*, 92 U. S. 289, 23 L. Ed. 710, in which the majority of the court said: "We are not called upon to vindicate the decisions of the supreme court of Illinois in these cases, or approve the reasoning by which it reached its conclusions. If the questions before us had never been passed upon by it, some of my brethren who agree to this opinion might take a different view of them," and upheld the decision appealed from upon the ground that the supreme court of the United States follows the construction given by the court of last resort to the Constitution and statutes of its own state. Three justices dissented. They held, Mr. Justice Strong writing the dissenting opinion, that the curative Act did validate the election. "It is argued, however, that the validating Act of April 17, 1869, is unconstitutional because it compels a municipal corporation to contract and pay a debt without its consent. It is said the election by which it was voted to subscribe was a nullity, and, therefore, that there never was any consent to the subscription. The argument is founded upon a complete misconception of the facts and of the law. The statute was in no just sense an Act to confer new power, or to impose a debt. It was what it purports to be,— an Act to cure the defective execution of a power already granted." Later the United States supreme court, in passing upon the validity of certain bond issues of Illinois communities, has refused to follow the rule of the Illinois court. (*Anderson* v. *Santa Anna Twp.*, 116 U. S. 356, 29 L. Ed. 633, 6 Sup. Ct. Rep. 413; *Bolles* v. *Brimfield*, 120 U. S. 759, 764, 30 L. Ed. 786, 7 Sup. Ct. Rep. 736.)

Not by any fair process of reasoning may it be said that the legislature in validating the election has *levied a tax* upon the inhabitants or property of a city for municipal or other pur-

poses. No legislative compulsion rests upon the city because of the curative Act. The corporate authorities may or may not levy taxes to pay the bonds. The curative statute which is the object of attack is simply a declaration that the election which the corporate authorities and people of Helena attempted to hold, but which was invalid because of the failure to follow statutory directions, which the legislature might have dispensed with in the first instance, is now valid. We fail to see any infringement upon the "home rule" doctrine, or to see the applicability of *Helena Consolidated Water Co.* v. *Steele,* 20 Mont. 1, 37 L. R. A. 412, 49 Pac. 382, or *State ex rel. Gerry* v. *Edwards,* 42 Mont. 135, Ann. Cas. 1912A, 1063, 32 L. R. A. (n. s.) 1078, 111 Pac. 734, to the condition here presented.

In the last analysis the question is one of legislative power. The law-making body had the power, and deeming that the conditions were such as to require remedial legislation, exercised that power. In so doing it cured the omissions of the corporate authorities and declared the election valid.

The fact conditions obtaining when we ordered the issuance of an injunction in this case have changed. The election was then invalid but for the reasons stated above is now valid. Upon the facts now presented it follows that the injunction issued pursuant to the original opinion, now being without support in law, must be and hereby is recalled and held for naught.

ASSOCIATE JUSTICES GALEN, FORD and MATTHEWS concur.

MR. JUSTICE ANGSTMAN, Dissenting: The Act in question is entitled: "An Act legalizing and validating all elections heretofore held in any city of this state authorizing the creation or increase of the indebtedness of such city, within 3% of the value of the taxable property of such city, for any of the purposes set forth in subdivision 64, section 5039, R. C. M. 1921, as amended, which elections were held after notice given as provided in section 5279, R. C. M. 1921, and at which the proposal to increase said indebtedness received a majority of all votes tendered and of all votes cast at such election."

It is not until we reach the body of the Act that we find special provision for validating the bonds. The body of the Act, after attempting to validate the election, provides: "and all such bonds whether issued or hereafter to be issued are legalized and declared to be valid and legal obligations of and against the city issuing the same."

The legal effect of the Act, so far as the contemplated Helena water bonds are concerned, is to compel their issuance. There is no discretion left in the city council if the election is valid. Action on the part of the council looking to the issuance and sale of the bonds is compulsory. Under section 5280, Revised Codes 1921, the city council must give notice for the sale of the bonds and because of section 5281 the proper officers must sign them. The Act deprives the city and its people of the right of local self-government which has heretofore long endured. (*Helena Consolidated Water Co.* v. *Steele,* 20 Mont. 1, 37 L. R. A. 412, 49 Pac. 382.)

Validating statutes operate only on conditions already existing and can have no prospective operation. (25 R. C. L. 823; 23 Cal. Jur. 611; *Snidow* v. *Montana Home for the Aged,* 88 Mont. 337, 292 Pac. 722.) But so far as the instant case is concerned the bonds have not been issued or sold. The statute attempts to validate something not yet in being. Its operative effect here is to create, not to cure. It will compel future action and not validate past transactions. It creates an indebtedness on the part of the city in the sum of $200,000 not now existing. This is also the effect of the Act if it is to be considered only from the standpoint of validating the election. Without the Act there was no election, as we have held. If the Act is upheld it instills life into that which is otherwise dead. It creates an election where none existed before. It provides the foundation for an indebtedness otherwise nonexisting.

In speaking of a validating statute, in *Cooper* v. *City of Bozeman,* 54 Mont. 277, 169 Pac. 801, this court, through Mr. Justice Sanner, said: "Finally, respondent invokes the provi-

sions of section 9, Chapter 142, Laws of 1915, as curative of all the defects pointed out in the complaint. For present purposes it may be assumed that these provisions are ample to cure all mere irregularities, and that they cover with their protecting mantle all such failures as are here recorded when they occur after proceedings sufficient to confer jurisdiction; yet, certain it is that the legislature cannot breathe the breath of life into a dead thing.'' This is the rule elsewhere.

Thus, the supreme court of Indiana, in *Seitz* v. *Mosier,* 192 Ind. 416, 136 N. E. 840, after quoting the language from Cooley on Constitutional Limitations quoted in the majority opinion in this case, said: ''But while the legislature has power to cure irregularities and defects which do not go to the essence of a proceeding, it is a general principle that when an act, proceeding or transaction is void for lack of power to do it, and not merely voidable on account of some formal defect, it cannot be cured by legislative action. (Sedgwick, Statutory Construction, 2d ed., 143, note; *Strosser* v. *City of Fort Wayne* (1885), 100 Ind. 443, 445.) It follows that, since there was no statute authorizing an election to be held in 1915, and the action of the citizens or some of them in going through the form of voting for trustees of the town of Clarksville at that time was wholly unauthorized by law, the supposed election was void for want of statutory power, and not merely irregular, and it could not be legalized by a statute afterward enacted.''

In *Herring* v. *Lee,* 22 W. Va. 661, the court said: ''If it was competent for the legislature to make a void proceeding or act valid, then said act might be invoked to sustain the deed in this case. But upon that question there cannot be a moment's hesitation. The legislature can no more impart binding efficacy to a void act than it can take one man's property and give it to another. Indeed to do one is to accomplish the other. What difference can it make whether the act directly or indirectly takes the property of one and transfers it to another? To made a void act valid and thus effect the transfer is the same thing as making the transfer directly.''

In *Booth* v. *Hairston*, 195 N. C. 8, 141 S. E. 480, the court in speaking of this subject, said: "But the power to cure a crippled instrument, having at least a spark of legal life, does not extend to raising a legal corpse from the dead."

In *Simpson* v. *Teftler*, 176 Ark. 1093, 5 S. W. (2d) 350, the supreme court of Arkansas, after declaring a certain election null and void, said: "And the law of 1927 declaring elections in no fence laws valid could not affect this election if it were void." To the same general effect are: *People ex rel. Kjellquist* v. *Chicago, Mil. & St. P. Ry. Co.*, 321 Ill. 499, 152 N. E. 560; *Maulding* v. *Skillet Fork River Outlet U. Drainage District*, 313 Ill. 216, 145 N. E. 227.

But assuming that the legislature has authority to validate whatever proceedings it might have authorized originally, I still think this Act must fall so far as the instant case is concerned. Section 26 of Article V of our state Constitution commands that the legislative assembly shall not pass local or special laws in certain enumerated cases, and that "in all other cases where a general law can be made applicable, no special law shall be enacted." The purpose of this requirement was to prohibit the enactment of a law affecting a particular locality which the legislative assembly was unwilling to give general application. Let it be assumed that House Bill 221 is a general law in the sense that it affects all communities coming within its terms. It is worthy of note, however, that the supreme court of Nebraska, in *Anderson* v. *Lehmkuhl*, 119 Neb. 451, 229 N. W. 773, went beyond the letter of a similar Act, and held that it was "for a special location and to inject life into bonds issued heretofore under proceedings declared void," and hence in violation of a constitutional provision identical with ours.

But assuming, as I have stated before, that it is a general law applicable to other cities besides Helena, still I think it attempts to cure that which the legislature could not have originally authorized, in this: The legislature could not originally have authorized Helena and some other cities to issue

bonds by holding an election under sections 5009, 5278 and 5279, while requiring all other cities to hold an election as provided in Chapter 98, Laws of 1923, as amended by Chapter 47, Laws of 1929. Such legislation would be condemned as class legislation. It would be as if the legislature by Chapter 98, Laws of 1923, had provided an exception in the case of Helena and such other cities as are now to be affected by the validating Act. The same infirmity that would have attached to Chapter 98, had it excepted Helena and some other cities from its requirements, must attach to the validating statute.

But as I view House Bill 221, in so far as it has application to the case before us, where the bonds have not been issued, it has no other effect than to compel Helena, and possibly other cities if any are similarly situated, to issue bonds without an election, as provided by law, whereas all other cities must submit the question to the taxpayers affected, as the law requires. I agree with the city's contention that since the indebtedness of the city will not exceed the constitutional limitation, it was competent for the legislature to authorize the issuance of the bonds by the city without any election. But to do so it must pass a general law and not one limited to only certain localities. The Act, in my opinion, is special and local and therefore prohibited by our Constitution, for clearly, if the legislature desired to empower or compel cities to issue bonds without an election or by conducting one as provided in sections 5009, 5278 and 5279, a general law could have been made applicable as was done when those sections were originally enacted.

So far as applicable to the instant case, House Bill 221 is not within the proper exercise of legislative power for another reason. A final judgment has been entered declaring the pretended election a nullity. The fundamental basis of our government is that the three great powers of government—the executive, the legislative and the judicial—shall be preserved as distinct from and independent of each other. (Sec. 1, Article IV, Const.) When final judgment was entered in this case,

it fixed the rights of the parties and the fruits of that judgment became property rights. In *Gilman* v. *Tucker*, 128 N. Y. 190, 26 Am. St. Rep. 464, 13 L. R. A. 304, 28 N. E. 1040, it was said: ''A judgment has here been rendered, and the rights flowing from it have passed beyond the legislative power, either directly or indirectly, to reach or destroy. After adjudication the fruits of the judgment become rights of property. These rights became vested by the action of the court, and were thereby placed beyond the reach of legislative power to affect.''

Mr. Justice Brewer, speaking for the United States supreme court in *McCullough* v. *Virginia*, 172 U. S. 102, 43 L. Ed. 382, 19 Sup. Ct. Rep. 134, said: ''It is not within the power of a legislature to take away rights which have been once vested by a judgment. Legislation may act on subsequent proceedings, may abate actions pending, but when those actions have passed into judgment the power of the legislature to disturb the rights created thereby ceases.''

The general rule is that the legislature cannot validate proceedings declared void by final judgment of a court of competent jurisdiction. The cases supporting this rule are collected in an exhaustive note to the case of *People* v. *Owen*, 286 Ill. 638, 122 N. E. 132, appearing in 3 A. L. R. 447.

The opposite conclusion was reached by the supreme court of South Dakota, in *Hodges* v. *Snyder*, 45 S. D. 149, 25 A. L. R. 1128, 186 N. W. 867. In that case we again find an extensive note beginning on page 1136 of 25 A. L. R., in which the author states that a majority of the cases hold that the legislature has the power to enact a curative statute affecting rights merged in a final judgment. But examination of the cases there cited as sustaining the majority view will disclose that most of them turn upon the proposition that in the particular case a public right or interest was involved over which the legislature had plenary power. (See *Wilcox* v. *Miner*, 201 Iowa, 476, 205 N. W. 847.) The South Dakota case of *Hodges* v. *Snyder*, was taken to the United States supreme court and as

reported in 261 U. S. 600, 67 L. Ed. 819, 43 Sup. Ct. Rep. 435, illustrates this principle.

Here it is true that the rights of the people of Helena are involved as well as those of plaintiff. But the legislature, unlike the power possessed by that of South Dakota concerning school districts, has no authority to directly impose an obligation upon the citizens of Helena. It cannot impose a debt or, liability upon the people of the whole state when in excess of $100,000 without their consent expressed at a valid election. (Sec. 2, Art. XIII, Const.) Under our system of government that question is one of local concern to be solved by the people affected, either directly or through their constituted officers. It cannot be compelled by legislative action. Hence, since the rights of the parties have been fixed by final judgment, and since the question of whether a city shall create an indebtedness is not within the legitimate sphere of legislative action, this case does not fall within the reasoning of the cases cited in the note in 25 A. L. R. 1136, as supporting the majority rule. And in none of those cases did the validating statute have the effect, as the one before us, of creating an indebtedness or obligation where none existed before its enactment. In all of them there was at least a moral obligation already existing.

The legislative Act here is simply a declaration on the part of the legislature that the court's decision in holding the election a nullity is erroneous. The court held the election a nullity. The legislature says it is good and valid.

What was said by the supreme court of Oklahoma in McLain v. Oklahoma Cotton Growers' Assn., 125 Okl. 264, 258 Pac. 269, fits this case. It said: "If this be not the correct rule then it would follow that the validating provisions of the amendatory Act here involved would, in effect, be a legislative direction to the judiciary to change its interpretation of the law in the given case, a proposition that in its application would be subversive of the fundamentals upon which the superstructure of popular government has thus long endured, to which no one under our plan of social order would subscribe."

Accordingly I am not able to concur in the views of my associates. I think the motion to dissolve the injunction should be denied.