STATE EX REL. PUBLIC SERVICE COMMISSION OF MONTANA ET AL., RELATORS, v. BRANNON ET AL., RESPONDENTS.

(No. 6,587.)

(Submitted November 5, 1929. Decided December 14, 1929.)

[283 Pac. 202.]

*Mr. L. A. Foot,* Attorney General, *Mr. L. V. Ketter,* Assistant Attorney General, and *Mr. Francis A. Silver,* of Counsel, submitted a brief; *Mr. Ketter* argued the cause orally.

*Messrs. Murphy & Whitlock, Mr. W. M. Johnston* and *Mr. Howard Toole,* for Respondents, submitted a brief; *Mr. Toole* argued the cause orally.

204

206

208

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

While the controversy arose chiefly over the question whether the salary of the assistant state chemist should be paid from the college funds or from the gasoline inspection fund, the argument has taken a wide range, and the theories of the respondents are not altogether consistent. One argument is based upon the willingness of the state chemist to have the work done under his supervision, and the assent of the other respondents to its being done in that fashion, provided all the expenses of doing it are paid for out of the gasoline fund. Another challenges the right of the legislature to compel the performance of the work under the terms of the Act, while still others are advanced attacking the practicability of the commission's position because of constitutional objections.

1. In support of their first position respondents say we should construe the Acts in question in accordance with

executive and legislative interpretation. They argue that, as the salary of an assistant was paid, partially at least, from the gasoline inspection fund from 1919 to April 1, 1925, and again from July 19, 1927, to June 19, 1929, we have an interpretation of the Act by the executive department of the state government extending over a period of years, and that the legislature "in substantially re-enacting the 1919 statute" must be deemed to have done so with full knowledge of the interpretation put upon that Act by the executive department.

It is a "settled rule that the practical interpretation of an ambiguous or uncertain statute by the executive department charged with its administration is entitled to the highest respect, and, if acted upon for a number of years, will not be disturbed except for very cogent reasons." (*Logan* v. *Davis,* 233 U. S. 613, 58 L. Ed. 1121, 34 Sup. Ct. Rep. 685, 690; *Swendig* v. *Washington Water Power Co.,* 265 U. S. 322, 68 L. Ed. 1036, 44 Sup. Ct. Rep. 496.) Another statement of the rule is that the aid of contemporaneous construction is invoked where the language of a statute is of doubtful import and cannot be made plain by the help of any other part of the same statute nor by the assistance of any Act *in pari materia* which may be read with it. The contemporaneous construction is that which it receives soon after its enactment. (Lewis' Sutherland on Statutory Construction, sec. 472.) But we fail to see how the statute in question is either ambiguous or of doubtful import. Chapter 203 (Laws 1919), with respect to the duties of the state chemist and the expense allowed for the performance of the work required, seems too plain to require construction. In the construction of a statute the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted. (Sec. 10519, Rev. Codes 1921.)

When the terms of a statute are plain, unambiguous, direct and certain, it speaks for itself, and there is nothing for the court to construe. (*Chmielewska* v. *Butte & Superior Min. Co.,* 81 Mont. 36, 261 Pac. 616.)

In the first place it was evidently not the intention of the ▉ legislature to create another bureau or department of the government. It could have created the office of state chemist and put that officer under the control of the state oil inspector or of the Public Service Commission, but it did not do so. In the interest of economy the law-making body saw fit to create as state chemist the head of the department of chemistry at the State College. Additional duties were imposed upon him, and it was provided that he might call to his assistance in the performance of the work an assistant in his department. To that extent the legislature imposed additional duties upon the department of chemistry. The legislature knew that the head of the department of chemistry had assistants serving under him. It provided an additional safeguard by requiring that the assistant entrusted with the work should be selected under the rules and regulations prescribed by the state board of education. It was intended that the work should be done by the state chemist or a well-qualified assistant. Thus impartiality and accuracy would be insured. It was contemplated that it might be necessary for the state chemist or his assistant to give testimony in court in behalf of the state, for which no further compensation than the mileage and fees prescribed by law for other witnesses should be paid. The provision that the work might be done by an assistant merely relieved the state chemist from doing the work himself. If the assistant was already receiving a salary from the state, there was no reason why any additional provision should be made for his compensation. If either the chemist or his assistant had the time to perform the work required for the salary already provided by law it was unnecessary to consider the subject of salary further, and such evidently was in the mind of the law-making body. If no burden entailing expense be added, there could be no good reason for compensating the assistant out of the state gasoline inspection fund. Furthermore, a consideration of section 16 of the Act of 1919 (Chap. 203) seems to put the subject beyond question. We observe that the salary and all necessary

traveling expenses of the deputy oil inspector are provided for, but all that is allowed the state chemist is "all necessary laboratory and traveling expenses." In allocating the fund we observe that two-thirds "shall be expended in payment of salary, traveling and other expenses of the State Oil Inspector and his deputies, including office help and equipment; one-third of said fund shall be expended in the * * * necessary expenses incurred by the State Chemist." The omission of salary from that part of the section which refers to the state chemist, while it is especially named in that part which refers to the inspector, is significant.

The construction given the law by the officers who allowed a portion of the salary of the assistant to be paid out of the gasoline inspection fund was palpably erroneous.

It is argued that it is to be presumed that the legislature, after the passage of Chapter 203, knew of the construction placed upon it by the executive officers (*City of Baltimore* v. *Machen*, 132 Md. 618, 104 Atl. 175), and that all statutes are presumed to be enacted by the legislature with full knowledge of the condition of the law (36 Cyc. 1146); further, that the weight to be given to executive or departmental practice is increased when the legislature in re-enacting the law or another law *in pari materia* fails to indicate in any way its disapproval of the settled construction of the officer or department (25 R. C. L. 1025).

Conceding the correctness of the principles relied upon, they are not applicable when there is a substantial change of phraseology, some change other than what may have been necessary to abbreviate the form of the law. (*McDonald* v. *Hovey,* 110 U. S. 619, 28 L. Ed. 269, 4 Sup. Ct. Rep. 142.) A change in the phraseology of an amendatory statute raises a presumption that a departure from the old law was intended. (25 R. C. L. 1051.) In the 1927 Act (Chap. 109) we do not find a re-enactment of the provisions of section 16 of the 1919 Act. We find in section 3 the provision that "all of the expenses incurred in the administration of this Act, or in enforcing the terms hereof shall be paid out of said fund in the

same manner as other claims against the State of Montana."
We see nothing here to warrant the payment of salaries. And
in section 17 of Chapter 109 we find the following: "The
Public Service Commission shall employ from time to time
such inspectors as said Commission shall deem necessary to
carry out the provisions of this Act, and said Commission
shall fix the compensation of such Inspectors. The Inspectors
herein provided for * * * in this Act and all expenses
of carrying out the provisions of this Act shall be paid from
said Fund."

However, as the two statutes are *in pari materia,* upon tak-
ing into consideration the above-quoted language from
section 3 and the words in section 17 of Chapter 109, "and
all expenses of carrying out the provisions of this Act shall
be paid from said Fund," we conclude that what may be
termed laboratory expenses of the state chemist are intended
to be included, but this is the greatest extent to which we are
permitted to go.

We therefore see no aid for the respondents under the head
of either executive or legislative construction.

2. Counsel for respondents make the broad statement that
since the University is established by the Constitution
for educational purposes, and since the management thereof
is vested in the state board of education by the Constitution,
the legislature is without power to impose a noneducational
and antagonistic function upon one of the University units.
While its functions are not specified in the Constitution, no
one will dispute the assertion that the main function of the
University is the education of youth. Yet its activities go
further than that. The University of Montana, as defined by
section 852, Revised Codes 1921, as amended by section 1 of
Chapter 6, Laws of 1927, while established and maintained
primarily for educational purposes, has wider functions than
mere scholastic instruction. The activities of modern univer-
sities embrace a wider scope than mere teaching. When suffi-
ciently financed, research and experimental work of great
value to the public is constantly being carried on by them.

As a part of the work scientific treatises, of high practical worth, are put forth which contribute substantially to state and national progress along industrial, economic and cultural lines. Indeed, the potentialities of service which may be rendered through these agencies cannot be compassed by any small measure. The knowledge diffused by these institutions radiates far beyond the student body.

The supreme court of Nebraska, in a case somewhat similar to this, and which will be referred to hereafter more at length, observed: "It has long since passed the stage of scholastic instruction and, in addition, is conducting practical experiments and applying knowledge for the benefit of the public, and incidentally aiding individuals, professions and industries." (*Fisher* v. *Board of Regents*, 108 Neb. 666, 189 N. W. 161, 164.)

It is not inapt to characterize the State University as a developmental arm or agency of the state, as has been suggested by two leading educators. (President Kinley; Chancellor Brannon; see Dr. Brannon's address as President of the National Association of State Universities, School and Society, Vol. XXIX, No. 753, June 1, 1929.)

Section 11 of Article I of the Constitution provides: "The general control and supervision of the state university and the various other state educational institutions shall be vested in a state board of education, whose powers and duties shall be prescribed * * * by law. * * * " Observe the care employed in the construction of this sentence. The general control and supervision of the State University and the various other educational institutions are vested in the state board of education whose *powers* and *duties* shall be *prescribed* and regulated by law. A law may be enacted by the people exercising the initiative or by the people acting through the legislature. In either case the power to enact a law is illimitable, except as restrained by the Constitution. (*Veto Case*, 69 Mont. 325, 35 A. L. R. 592, 222 Pac. 428; *State ex rel. Jones* v. *Erickson*, 75 Mont. 429, 244 Pac. 287.)

The assertion that the legislature is without power to prescribe or regulate the functions of the University or one of its units cannot be admitted. That the board of education is "within the scope of its functions, co-ordinate and equal with the legislature" must be denied. "The powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted." (Sec. 1, Art. IV, Constitution.)

The board of education is a part of the executive department, and is but an agency of the state government. The legislature may prescribe the extent of the powers and duties to be exercised by the board in the general control and supervision of the University of Montana. The legislature may broaden the functions of the University, or any of its units. It may require research and experimental work to a greater extent than is now being carried on, and for the public benefit may require the discharge of functions in new fields. In other words, the state may extend, and add power to, its developmental arm.

But it is said the legislature may not require the University to perform an "antagonistic function." We fail to see how the work required is antagonistic to other functions of the college. "Antagonistic" means "combating, contending or acting against." (Webster's New International Dictionary.) Nor do we see how the principle is destructive of the concept of the functions of the college. The requirement may be out of the ordinary, but we cannot hold that it was beyond the power of the legislature to require it. (*Fisher* v. *Board of Regents, supra; State ex rel. Heimberger* v. *Board of Curators*, 268 Mo. 598, 188 S. W. 128.)

In passing upon the constitutionality of a statute, courts must indulge every presumption in favor of its validity, the question being not whether it is possible to condemn but

whether it is possible to uphold the Act; they will not declare it invalid unless its unconstitutionality is shown beyond a reasonable doubt, and, if two constructions are possible, one of which will result in its constitutionality and the other in its invalidity, they will adopt the former. (*Hale* v. *County Treasurer*, 82 Mont. 98, 265 Pac. 6.)

The Constitution of Nebraska declares that the general government of the University of Nebraska shall, under the direction of the legislature, be vested in a board of six regents, and that their duties and powers shall be prescribed by law. Note the similarity between this provision and our section 11, supra. The legislature of that state passed an Act requiring the board of regents of the State University to establish a plant for the production of hog cholera serum, requiring the department of animal pathology of the University to carry on the production and preparation of the serum under the provisions of the Act, and providing that the serum should be furnished to the state veterinarian or his authorized deputies, at the actual cost of production, and also requiring the department to distribute the serum to farmers and swine growers, residents of Nebraska, at the actual cost of its production. Many objections were lodged against the Act. The court in *Fisher* v. *Board of Regents*, supra, said that "the most formidable argument is directed to the proposition that the board of regents of the University of Nebraska is limited fundamentally to educational duties, and that therefore the lawmakers cannot require it to engage in the business of manufacturing and distributing hog-cholera serum as an article of commerce." The court, after reviewing the constitutional and statutory provisions relative to the University, concluded that the question was not one of policy or wisdom, but of legislative power, and declared that "a constitutional provision prohibiting the legislature from authorizing the operation of a hog-cholera serum plant at the state agricultural college or from imposing new duties on the board of regents has not been pointed out or found."

The intention of the legislature was to prevent the sale of inferior gasoline and kerosene in this state; the law provides for the maintenance of certain standards and provides for the prosecution of those who transgress its provisions. Society in general is affected; it may be said that one of these petroleum products is used for one purpose or another by almost every family in the state; the well-nigh universal use of gasoline needs no comment.

Solicitude for the public welfare is the basis of the law. In order that the analyses might be made with accuracy and impartiality, the head of the department of chemistry at the College of Agriculture and Mechanic Arts was made state chemist and he, to that extent at least, thus became a public officer. It was competent for the lawmakers to prescribe his duties as such and to require him to perform the same without any compensation other than that which attaches to his position as head of the department of chemistry. (*State ex rel. Rowe* v. *District Court*, 44 Mont. 318, Ann. Cas. 1913B, 396, 119 Pac. 1103; *Peterson* v. *City of Butte*, 44 Mont. 401, Ann. Cas. 1913B, 538, 120 Pac. 483.)

We find no constitutional objection against the power of the legislature to require the department of chemistry to analyze samples of gasoline and kerosene.

No question here arises as to any violation of Mr. Kirk's contract with the state. He assumed his position after the law came into effect, and the law became part of his contract. (*Home State Bank* v. *Swartz*, 72 Mont. 425, 234 Pac. 281.) It is agreed that the entire time of Mr. Kirk is taken up in the performance of his duties as head of the department of chemistry, and that he has no time personally to perform the analyses. Were it otherwise, he would be obliged to do so. Having in mind this situation, the legislature provided that, in the discretion of the state chemist, the analyses might be made by a competent assistant under his supervision, "provided, however, that such assistant shall be appointed under the rules and regulations of the State Board of Education." (Laws 1927, Chap. 109, sec. 10.) This

provision, we think, goes no further than to insure that the assistant shall be competent. It implies that the assistant shall be a member of the state chemist's staff rather than the contrary.

3. Every consideration leads us to conclude that the legislature intended that the analyses should be made by a salaried employee of the college, i. e., either by the head of the department or someone upon his staff. Neither the law of 1919 nor that of 1927 contemplates the payment of salary to the assistant, as we have determined. Each legislature has appropriated money ''for the payment of salaries and other expenses'' of the college. The great bulk of the college revenue comes from these appropriations. Doubtless the legislature, if it saw fit, could in express terms make it the duty of the college to make analyses of gasoline and kerosene at college expense, but it is not to be presumed that it would do so without either making a commensurate appropriation therefor, or specifying expressly that the expense entailed should be paid out of the general college appropriation. We think the legislature intended to go no further than to impose additional duties upon the state chemist and his assistant, already on the college payroll, relieving the college of laboratory expenses which must be paid from the gasoline fund.

The record does not disclose that the college was put to additional expense by reason of the additional duties imposed upon the department of chemistry. Consequently we find it unnecessary to discuss some constitutional questions raised by counsel for respondents. The Act provides that claims shall be paid out of the gasoline inspection fund in the same manner as other claims against the state are paid. Such claims must be presented to and can only be allowed by the state board of examiners. (Const., Art. VII, sec. 20; secs. 232, 238, Rev. Codes 1921.)

It seems to have been the idea of the commission on the one hand, and the respondents on the other, that the commission has the authority to pass upon the validity of claims against the fund and to order or refuse payment

thereof. That the commission may authorize the expenditure of moneys from the fund, as provided by the terms of the Act, there can be no doubt, but that it has the right to direct the payment of moneys from the fund is fallacious. In the orderly process of administration it is doubtless true that ordinarily the board of examiners would not direct the payment of a claim bearing the disapproval of the commission, and that the board would order the payment of claims. approved by the commission. But this is a mere matter of administrative practice. The fact remains that the board of examiners may order payment of money from the fund without the approval of the commission, and, indeed, over its protest.

It appearing that a legal duty rests upon Mr. Kirk as state chemist, and that the commission has funds sufficient to pay the expenses contemplated by statute for making the analyses, it is ordered that a peremptory writ of mandamus as prayed for issue.

ASSOCIATE JUSTICES MATTHEWS, GALEN and FORD and HONORABLE J. J. LYNCH, District Judge, sitting in place of MR. JUSTICE ANGSTMAN, disqualified, concur.

Rehearing denied December 31, 1929.