"The grant of lands for school purposes by the federal government to this state constitutes a trust (State ex rel.Bickford v. Cook, 17 Mont. 529, 43 P. 928; State ex rel.Dildine v. Collins, 21 Mont. 448, 53 P. 1114; State ex rel.Koch v. Barrett, 26 Mont. 62, 66 P. 504); and the State Board of Land Commissioners, as the instrumentality created to administer that trust, is bound, upon principles that are elementary, to so administer it as to secure the largest measure of legitimate advantage to the beneficiary of it." The constitutional provisions referring to the grant of lands for school purposes "are limitations upon the power of disposal by the legislature. (In re *Page 111 Beck's Estate, 44 Mont. 561, 121 P. 784, 1057; Newton v.Weiler, 87 Mont. 164, 286 P. 133.)" (Rider v. Cooney,94 Mont. 295, at 307, 23 P.2d 261.)
Chapter 61, Laws of 1935 (H.B. 124), "An Act relating to the tenure of leases of state lands for grazing purposes, heretofore issued by virtue of the provisions of Chapter 42 of the Laws of 1933; providing for the extension thereof," is unconstitutional in that it destroys the object of the trust — "the largest measure of legitimate advantage to the beneficiary," "the greatest benefit to all." It totally destroys the idea of either full value or market value. It creates a favored class without regard to the rights of the beneficiaries of the trust, or of the other citizens of the state. It destroys competition. It is a special law for the favored few capable of taking advantage of it. It deprives other citizens of a chance to bid, or of the beneficiary to protect the trust by securing other or higher bidders. It destroys the power of discretion and independent action by a constitutionally created board in whom that power is lodged and amounts to an administrative act of leasing being done by the legislature. It destroys constitutional contractual assurances and guaranties. It violates constitutional guaranties as to retrospective legislation, special benefits, equality and due process of the law. It is monopolistic in the extreme.
The case of Rider v. Cooney, supra, quickly disposes of several of the questions which might arise in this case. That decision makes it clear that state land leases are a disposal of lands within the meaning of the Constitution and that full "market value" is synonymous with actual value. The constitutional provision under consideration (sec. 1, Art. XVII) prohibits leasing of state lands unless the actual value is paid or secured.
In the case of State ex rel. Haire v. Rice, 204 U.S. 291,27 Sup. Ct. 281, 51 L.Ed. 490, from Montana, the contention was made that the legislature could do as it chose in the matter of disposing of the granted lands, because it was the agent of the government of the United States. This theory was expressly denied by the Supreme Court of the United States. The legislature, even though it may be conceded that it may regulate, *Page 112 
has no power to thwart the intention of Congress, the state Constitution, and elementary principles of trusteeship.
The Constitution and this court's decisions recognize the wide discretion that must of necessity be lodged in a board that has the administration of the trust. No one can dispute but that the trust must be administered under elementary principles of fair dealing and right, and to the end that the beneficiary gets the best results consistent with safety and honesty of purpose and administration.
Cases in point are not many because it is doubtful if any legislature has ever before attempted to defeat an opportunity for a higher return to the trust. However, there are cases where the question has come upon the land boards or commissions not getting the highest return for the trust. These have been proceedings in mandamus, and while in practically every instance the courts have announced their hesitancy to coerce bymandamus a constitutionally created officer, they have not hesitated to do it where a greater advantage could be secured. Therefore, if such a board can be coerced to get a better price, they can be restrained from taking a lesser one, particularly where their only excuse is a very doubtful power in the legislature to dictate their discretion. See East Side BlaineCounty Live Stock Assn. v. State Board, 34 Idaho, 807,198 P. 763, where a constitutionally created board attempted to do what the legislature of Montana would compel the Montana board to do. (Bucknum v. Johnson, 21 Wyo. 26, 127 P. 904; Walls v.Evans, 38 Wyo. 103, 265 P. 29.) Colorado, under similar constitutional provisions, has had the question of greatest benefit and also the question of discretion in the board before it in some two or three cases. While recognizing the power of the legislature to pass regulatory laws, the Colorado court says plainly that there is a limit where the legislative action would prevent getting the highest price. (In re Canal Certificates,19 Colo. 63, 34 P. 274; Routt v. Greenwood Cemetery LandCo., 18 Colo. 132, 31 P. 858; State v. Field, 31 N.M. 120,241 P. 1027.) *Page 113 
The Act directs and commands the board and commissioner to lease for a three-year period to the lessees designated in the Act upon their mere demand and at an arbitrary and fixed rental charge these trust lands. If it should be admitted that the power to make regulations is broad enough here, can the legislature delegate to private persons a legislative power or function? In a case arising from Kentucky, the legislature passed a statute requiring employers to furnish wash-rooms for their employees, making it depend upon the vote of a specified percentage of the employees. The statute was attacked on the ground that it was an unlawful delegation of legislative power in that it takes effect upon the approval and decision of an authority other than the general assembly. The court condemned the Act as an attempt to delegate legislative power. (Commonwealth v. Beaver Dam CoalCo., 194 Ky. 34, 237 S.W. 1086, 27 A.L.R. 920.) Here the legislature says that these leases are extended "at the option of the lessees," in effect saying that if the lessee does not wish to exercise his option, then the lands shall be leased under the terms of Chapter 42, Laws of 1933. In other words, this Act shall be operative only to those individuals who hold the old leases, and only when they each, as individuals, exercise this discretion. Thus, not only are those who do not have leases at the mercy of these lessees, but also the state of Montana, the public schools, the state buildings, etc., are dependent for their income on the whim of separate individuals.
The question has also been presented to the courts of the various states and the United States under the so-called "zoning laws." In these cases the legislature has made the operation of the law depend upon the vote of individual property owners within the restricted districts. Under such type of "zoning law" the courts have uniformly held that it was an unlawful delegation of legislative power and therefore unconstitutional. (State ex rel.Nehrbass v. Harper, (1916) 162 Wis. 589, 156 N.W. 941, 40 A.L.R. 347; Wasilewski v. Biedrzycki, (1923) 180 Wis. 192,192 N.W. 989, 40 A.L.R. 348; Utica v. Hanna, (1922) *Page 114 202 App. Div. 610, 195 N.Y. Supp. 225; State v. Crawford, (1919) 104 Kan. 141, 177 P. 360, 2 A.L.R. 880, and annotation;Rowe v. Ray, (1930) 120 Neb. 118, 231 N.W. 689, 70 A.L.R. 1056; 6 R.C.L. 164, sec. 165; 12 C.J. 842, sec. 327; 1 Cooley, Const. Limitations, 8th ed., 224 et seq.)
Under Article XVII, section 1, of the Constitution, and the laws of the state, all those who graze livestock, and who comply with the regulations of the state land board regarding the leasing of state-owned grazing land, are entitled to compete against one another by bidding, in attempts to lease this land. Such is the general class affected. But this Act attempts to make a further classification by saying that merely because a few members of the general class were fortunate enough to obtain leases on this land, they are to be excluded from the necessity of competing with others for a three-year lease. The question of arbitrary classification and discriminating class legislation has been before the courts of this country many times. Class legislation is repugnant. Here we have a glaring example of it. (See Hing v. Crowley, 113 U.S. 703, 5 Sup. Ct. 730,28 L.Ed. 1145; Atchison, Topeka Santa Fe R. Co. v. Matthews,174 U.S. 96, 19 Sup. Ct. 609, 43 L.Ed. 909; Iowa Motor VehicleAssn. v. Board of Railroad Commrs., 207 Iowa, 461,221 N.W. 364, 75 A.L.R. 1; Prescott Currier, Inc. v. Moore, 35 Ariz. 26,174 P. 163.) This court has had occasion to pass on the question of special and discriminatory legislation several times. (State ex rel. Redman v. Meyers, 65 Mont. 124, 210 P. 1064;State ex rel. Federal Land Bank v. Hays, 86 Mont. 58,282 P. 32; State ex rel. Powell v. State Bank of Moore,90 Mont. 539, 4 P.2d 717, 80 A.L.R. 1494; State ex rel.Roundup Coal Min. Co. v. Industrial Acc. Board, 94 Mont. 386,23 P.2d 253; State ex rel. Fisher v. School Dist. No. 1,97 Mont. 358, 34 P.2d 522.)
The Act is violative of section 27, Article III, of section 26 of Article V, of section 4 of Article XI, of section 11 of Article XII, of section 1 of Article XIII, of section 13 of Article XV, of sections 1 and 2 of Article XVII, of the Montana Constitution, *Page 115 
and of the Act of Congress under which the state was created and admitted as a state to the United States and under which the lands in question were granted to the state.
Mr. C.H. Loud, Mr. S.P. Wilson, Mr. J.A. Poore, Mr. W.G.Gilbert, Mr. Max P. Kuhr, Mr. Ernest A. Peterson, Mr. P.R. Heily,Mr. L.J. Onstad, Mr. E.A. Overland, Mr. W.C. Husband, Mr. W.R.Flachsenhar, Mr. Thomas Dignan, Mr. M.L. Parcells, Mr. John A.Tressler, Mr. Harry P. Bennett and Mr. T.B. Weir, AmiciCuriae, submitted a brief.
The rule laid down in Rider v. Cooney, 94 Mont. 295, is that the legislature may by statute fix the "asking price" for these noncompetitive leases; that there being no competition — no active market — the legislature is as competent as anyone else to fix an "asking price" based on its general knowledge of "values" of these leases. If the legislature may in such cases fix the asking price, by the same authority it may fix the term for which such leases are to run. It is idle to say it may fix the "asking price" on these noncompetitive leases, but that it has no power to fix the lease term, and the case in hand furnishes an example of why this is so. Having the power to fix the "asking price," is it within reason to say the Land Department may nullify the legislative Act by refusing to issue leases for a sufficiently long term to give them the value fixed by the legislature; or stated differently, why say the legislature may fix the "asking price," if the Land Department can establish a policy (the one-year lease policy) which results in a lease without value. It must be admitted that a lease for one year only, or a five-year lease by the terms of which the Land Department may cancel it at the end of any year, is practically valueless to a stockman who expects to stay in the business. It does not give him time to mature his stock, and leaves him confronted with the hazard of being compelled to dump his stuff on the market at the *Page 116 
end of any lease year, because the Land Department has seen fit under its policy to cancel his lease.
If it be conceded that the livestock grower furnishes the only market there is or can be for these grazing leases, then it will be seen — as the legislature saw in 1935 — that this "short-term policy" established by the Land Department was destroying the only market there is for the leasing of these grazing lands. And it was to remedy this actually existing situation that House Bill 124 was passed.
The power in the legislature by which that body may fix the "asking price" furnishes authority for its prescribing the lease term, under the conditions outlined. In the words of the Enabling Act, "The said lands may be leased under such regulations as the legislature may prescribe; but leases for grazing and agricultural purposes shall not be for a term longer than five years."
House Bill 124 automatically extended the short-term leases to five years. So the legislature having the power to fix the lease term, and finding the Land Department "short-term" policy destructive of the only market for these grazing leases, the legislature by House Bill 124 increased the term of all short-term leases to five years, and that Act took effect before the expiration of those short-term leases on February 28, 1935. No other meaning can be read into the Act.
The element of competition is not involved here and this case is controlled by the Rider decision. House Bill 124 having extended to five years the term of the "short-term" leases, the land here in question is not open to lease, because the present leaseholder has under the Act the right to hold for the remainder of the five years, and therefore the land cannot be open for lease, and the element of competition cannot exist, leaving this case to be controlled by the decision in the Rider Case. That this proposition is inescapable is clearly demonstrated if we for the moment dismiss the question of the power of the legislature to regulate these leases. *Page 117 
If we dismiss for the moment all question of legislative authority to act, who, then, would say that the present holder of these "short-term" leases has not, under the terms of House Bill 124, the absolute and unconditional right to have his term extended to the five years?
The only argument advanced against this proposition is that by the Enabling Act and by the Constitution, the legislature is denied the power to enact House Bill 124, but granting that the legislature has the power, then there is no escape from the proposition that under House Bill 124 the present lessees have the right to hold the land for the full five years, and that the land is not now open to lease, and the element of competition cannot enter into this case.
The legislature had the power to enact the statute. Starting with the proposition that the legislature is sovereign, and has all power of a state not denied it by the Enabling Act or by the Constitution, we find that by the Enabling Act "the said lands may be leased under such regulations as the legislature may prescribe." And we find that by the Constitution (Art. XI, sec. 4) the state board of land commissioners is created and given "the direction, control, leasing and sale of the school lands * * * under such regulations and restrictions as may be prescribed by law." The only sources from which the law in question may be prescribed are (1) the Enabling Act, (2) the Constitution, and (3) the legislature.
That the power exists in the legislature to fix the lease term is decided in the Rider Case. (94 Mont. 295.) This leaves us with but one other question presented here, viz.: Is the House Bill 124 class legislation, in violation of section 26 of Article V of the Constitution? That section contains no specific prohibition on this subject. It concludes with the words: "In all other cases where a general law can be made applicable, no special law shall be enacted." The quoted language has no application here. The Act applies to all alike; it is not limited geographically; it is not limited as to individuals or corporations coming within its scope. True it applies only to the extension of term *Page 118 
of grazing leases on state lands, but such limitation in its scope does not bring the Act within the proscribed "local," or "special" or "class" legislation referred to in section 26. (State ex rel. Ford v. Schofield, 53 Mont. 502,165 P. 594.)
One might as well say an Act providing terms for registration of state warrants is class legislation, because its effect is limited to holders of the warrants.
The only question for determination is this: Can the legislature extend these leases for three years when opportunity exists to secure a larger rental during the period of such extensions?
It must be accepted that had the state board of land commissioners executed five-year leases instead of the two-year leases here in question, the plaintiff seeking to secure a cancellation of such leases would have to allege and prove that the rental fixed was not the market value at the time the leases were made, and the proof would be directed to the market value in 1933 and not to the market value in 1935. The complaint does not in anywise attack the values in 1933, and there is no issue upon this subject before the court.
The fundamental error of plaintiff's complaint arises from a failure to note the distinction between the intent, purpose and language of Chapter 42 of the Laws of 1933 and House Bill No. 124. The 1933 enactment fixed the maximum noncompetitive rental rate for said leases. The sole and only purpose of House Bill No. 124 was to extend existing leases executed pursuant to Chapter 42 for an additional period of three years so that such leases would be on a parity with the five-year leases executed pursuant to the same chapter. No new leases are contemplated, no renewals are provided for, and the complaint by its very language, both throughout the allegations thereof and in the prayer, uses the word "renew," whereas House Bill No. *Page 119 
124 uses only the words "be extended." This distinction goes to the heart of the determination of this case. The distinction is this: The Constitution provides that no estate or interest in the state lands shall ever "be disposed of * * * unless the full market value of the estate or interest disposed of * * * be paid or safely secured to the state." Under the decision in the RiderCase the granting of a new lease upon state lands "disposes of an interest therein."
Chapter 42, therefore, authorized a disposal of an interest in state lands at a price, and if that price could be demonstrated to be under market value, the constitutional limitation would apply. Until such demonstration were made the leasing pursuant to Chapter 42 was valid and still is. By House Bill No. 124 the legislature sought not to create new leases, not to make new disposals of interests in state lands, but limited its purpose solely to the extension of already existing leases validly executed pursuant to Chapter 42, and unless plaintiff can demonstrate beyond doubt to the court that a mere extension of an existing estate for an additional three-year period, still within the five-year limitation fixed by the Enabling Act, is a "disposal of an interest in lands," he has no foundation stone upon which to build his complaint.
The difference between "extending" and "renewing" is clear beyond controversy.
"A stipulation to renew a lease for an additional term is distinguished from one to extend the same, in that the former requires the making of a new lease, while the latter does not." (Howell v. Hamburg Co., 165 Cal. 172, 131 P. 130; Orton
v. Noonan, 27 Wis. 272, 282; Brenneke v. Smallman, 2 Cal.App. 306,83 P. 302, at 304; Candler v. Smyth, 168 Ga. 276,147 S.E. 552.)
The Act relates only to those leases terminating on February 28, 1935, which were issued by the state board of land commissioners for a period of two years or less, and which were issued pursuant to the provisions of Chapter 42, supra, and it provides that those leases, and those only, shall be extended for a three-year period. *Page 120 
The legislative intent being clear, is the power of the legislature limited by the provision of the Constitution providing that an interest in state lands shall not be disposed of except at full market value? We confidently take the position that by no stretch of the rules of constitutional interpretation can the words "dispose of" in our Constitution be held to refer to a mere extension of a lease. The granting of the original lease was a disposition of a term of years. The extension of that lease is not the making of a new lease; it is not the making of a new term; it is not disposing of any interest. It is merely prolonging the existence of an already granted term of interest.
If, as we contend, the extension of this already granted two-year lease does not create a new lease, does not create a new interest in land, does not dispose of an interest in land, then the Enabling Act limitation of the five-year period must apply and no lease can be extended under any circumstances so that the total term of the lease exceeds five years. It is evident that the legislature had exactly that limitation in mind in the drafting of House Bill No. 124.
Should it be argued that the complaint alleges that the leases as to said lands were extended without obtaining full market value therefor, the answer is that such allegations do not relate to the time of the actual extension which was made by the enactment itself, but rather to the date of the making of the complaint, that is, the fifth day of April, 1935. And also the allegations as to the market value are specifically denied and are an issue of fact which would have to be determined as any other issue of fact before a final decision could be made, the distinction being that there was not competition at the time of the actual extension.
And finally, should it be held that an extension of a lease does "dispose of" an interest in the state lands, then the issue of fact as to whether or not the rental provided in Chapter 42 is below market value must receive determination. The mere fact that plaintiff is willing to pay more for the lands under consideration than the amount fixed in the lease is not the sole criterion "of actual value" or "market value." *Page 121 
C.R. Rathbone instituted this special proceeding to enjoin the state board of land commissioners from extending leases issued pursuant to the Act of 1933, in conformity with the direction contained in Chapter 61, Laws 1935.
Briefly, the complaint herein shows the following facts: Certain state lands were leased to J.B. Long Co. in 1933 for a term expiring February 28, 1935, at the leasing price fixed by Chapter 42, Laws 1933, for noncompetitive leases. Long Co. applied for an extension of its lease under the terms of Chapter 61, Laws 1935, but the extension has not yet been granted. The lands leased to Long Co., by reason of their proximity to plaintiff's lands, are desired by plaintiff, and he is willing and able to pay a greater amount for leases thereon than the maximum noncompetitive prices fixed by Chapter 42, Laws 1933, and has made application for leases thereon.
It is alleged in the complaint that there are approximately 1,175 leases, covering 968,000 acres of state land, in the same situation as the J.B. Long Co. lease, and approximately 246 applicants in the situation of this plaintiff. It is further alleged that the full market value of the leases is substantially higher than the leasing prices fixed by Chapter 42, Laws 1933.
On the filing of the complaint an order to show cause why the board should not be restrained from extending the J.B. Long Co. lease unless and until the lands covered by the lease were opened for competitive bidding was duly served, and in response thereto the defendants filed a general demurrer to the complaint. Thereafter, J.B. Long Co. was granted leave to intervene and filed its complaint in intervention, alleging its compliance with the requirements of Chapter 42, Laws 1933, and Chapter 61, Laws 1935, and that it is entitled to have its lease extended. It denies that the full market value is substantially, and any, higher than the rental fixed in the lease in accordance with the Act of 1933. *Page 122 
All questions here presented are determined in the opinion inLeuthold v. Brandjord, ante, p. 96, 47 P.2d 41, except as to the right of a leaser to have his lease extended when there is another applicant for the land leased, thus, ordinarily, requiring the land to be exposed to competitive bidding and giving the leaser but a preference right to lease at the highest rate bid by any other applicant. (Sec. 35, Chap. 60, Laws 1927.)
There is no question but that the state board, in the[1] discharge of its trust, should, when leasing these state lands, "secure the largest measure of legitimate advantage to the beneficiary of it." (Rider v. Cooney, 94 Mont. 295, 23 P.2d 261, 263.) Nor can it be successfully maintained that the board has power or authority to renew an expiring lease at the noncompetitive leasing price when there is another applicant willing and able to pay a higher rental, for the statutory rate is recognized as the "full market value" which has been ascertained "in the manner provided by law," as required by section 1, Article XVII, of the Constitution (Rider v.Cooney, supra), only when there is no competition. (Chap. 42, Laws 1933.)
But the prohibition against leasing such lands at less than "the full market value" means, and can mean only, that the state board shall secure the full market value of the lease at the time such lease is issued. No one will contend that leases issued in 1933, at the then full market value of the interest in the land, whether determined by competitive bidding or by legislative Act, for the term expiring February 28, 1938, could be canceled in the spring of 1935 and the lessee required to pay an advanced rental because another advised the commissioner that he would be willing to pay more than the rental provided for in the lease. Such an Act, if possible of accomplishment, would be to secure, not a "legitimate advantage," but an illegitimate advantage.
Clearly, the legislative intention in 1933 was that the "universal practice" of the Land Department in issuing five-year leases expiring on the last February 28, should be continued in renewing noncompetitive leases after the passage of the Act *Page 123 
of 1933. When the legislature discovered that, in certain instances, this practice had been departed from, that body promptly declared that all such short-term leases must be "extended" in order to give to the lessees "the same privileges, benefits, and advantages as are under authority of law conferred upon persons holding leases of such lands for a five-year period." (Chap. 61, sec. 1, Laws 1935.)
Here the legislature is presumed to act with full knowledge of[2] the facts calling for such legislation (Chicago etc. Ry. Co.
v. Tompkins, 176 U.S. 167, 20 Sup. Ct. 336, 44 L.Ed. 417;[3] Rider v. Cooney, supra), and if two constructions of the Act are possible, it is our duty to adopt that construction which will render the Act constitutional (State ex rel. Diederichs v.State Highway Commission, 89 Mont. 205, 296 P. 1033; State exrel. Public Service Commission v. Brannon, 86 Mont. 200,283 P. 202, 67 A.L.R. 1020).
The Act of 1933 and that of 1935 are in pari materia and[4, 5] must be read and construed together (23 Cal. Jur. 787); they are, in effect, but one Act declaring the intention of the legislature that, from 1933 on, noncompetitive leases shall be issued for the customary five-year term at the rates therein fixed. As certain of the leases issued in 1933 did not in this respect conform to the intention of the legislature, that body simply declared that such leases must be "extended" to meet the requirement imposed upon the Land Department by the legislature. "Extended" means "stretched, spread or drawn out," and its use conveys an entirely different meaning from the use of the term "renewed"; under the former the term of a lease is merely enlarged, "stretched," upon all the terms and conditions of the instrument; while, under the privilege of renewal, a new lease is indispensable. (Lang v. Pacific B. M. Co., 44 Cal.App. 618,187 P. 81; Meyering v. Miller, 330 Mo. 885,51 S.W.2d 65; Candler v. Smyth, 168 Ga. 276, 147 S.E. 552, 554;Quinn v. Valiquette, 80 Vt. 434, 68 A. 515, 14 L.R.A. (n.s.) 962; Gray v. Maier Zobelein Brewery, 2 Cal.App. 653,84 P. 280.) *Page 124 
The Act of 1935, therefore, does not authorize the re-leasing of the lands in question, at the date of the expiration of existing leases, regardless of conditions then existing, but directs the correction of an administrative error committed at the time the leases in question were issued, by commanding that such leases as were issued for a short term shall have their terms "stretched, spread or drawn out" to conform to the terms of other leases issued at approximately the same time, but issued for the contemplated period, without affecting the terms and conditions of such leases. This action, we conclude, constitutes a valid "regulation" of the Land Department within the meaning of the constitutional provision, and within the decision in Rider
v. Cooney, supra, and that In re Leasing of State Lands,18 Colo. 359, 32 P. 986, and, therefore, it is immaterial that this plaintiff was, at a time subsequent to that when the J.B. Long Co. lease should have been "extended," ready and willing to bid more for a lease on these lands if the Land Department would cancel the Long lease, or that a lease on these lands was then worth more in the market than the rental required under the lease, if this be a fact, for the lands were not open to lease or disposition in the face of the fact that the leaser had complied with the requirement of the Act by applying for an extension of the lease before February 28, 1935.
The action required by Chapter 61, Laws 1935, does not violate the prohibition of section 1, Article XVII, of the Constitution, in this regard, and, therefore, the writ must be denied.
Plaintiff's application for a writ of injunction is denied and this proceeding dismissed.
ASSOCIATE JUSTICES STEWART, ANDERSON and MORRIS concur.
MR. CHIEF JUSTICE SANDS, being absent on account of illness, takes no part in the above decision.
Rehearing denied June 22, 1935. *Page 125